471 A.2d 833

**Michael BARTASAVICH, Appellant,**

v.

**Donald MITCHELL, In His Capacity as Director of Clearfield County Children's Services, and Clearfield County Children's Services, and Dennis Geppert, and Adeline Geppert.**

**In re Michelle BARTASAVICH.**

**Appeal of Michael BARTASAVICH.**

**In re Michelle BARTASAVICH.**

**Appeal of Michael BARTASAVICH.**

Superior Court of Pennsylvania.

Argued Sept. 28, 1983.

Filed Jan. 13, 1984.

Michael J. Bresnahan, State College, for appellant.

Kim C. Kesner, Clarion, for appellees.

Before BROSKY, McEWEN and BECK, JJ.

BROSKY, Judge:

These consolidated appeals are from three orders of the same date which: (1) terminated appellant Michael Bartasavich's parental rights; (2) denied Mr. Bartasavich's petition for visitation; and (3) granted custody of Michelle Bartasavich to Clearfield County Children's Services for purposes of placing her for adoption. For the reasons that follow we reverse and remand for further proceedings.

Appellant is the father of Michelle who was born on December 22, 1971 to Mr. Bartasavich and his wife, Mary. On October 14, 1974, during a domestic dispute, appellant stabbed and killed his wife. He immediately took his then two year old daughter to the home of a neighbor, returned home and stabbed himself with a fork. Mr. Bartasavich was arrested and charged with his wife's homicide while in the hospital recuperating from his self-inflicted wounds.

On October, 1974 while an inmate at the Clearfield County Jail, appellant signed a petition which led to the placement of Michelle in the custody of Clearfield County Child Welfare Services.

The Child Welfare service permitted Michelle's maternal grandparents, with whom she had been staying since her mother's tragic death, to retain custody of her. Michael Bartasavich entered a guilty plea to a charge of voluntary

manslaughter, and in February 1975, was sentenced to a term of imprisonment of 5 to 10 years.

From October, 1974 to June, 1976 Michelle was taken by her grandparents [1] to visit with her father who was incarcerated from October, 1974 to October, 1979.

In June, 1976, Clearfield County Child Welfare Services permitted the Gepperts to stop taking Michelle to visit her father, because she had apparently displayed a negative reaction to the visits. The Gepperts reported that Michelle suffered stomach ailments and other manifestations of anxiety during the periods surrounding the visits.

The Gepperts claim that Michelle feared her father. A psychologist retained by appellant when the visits ceased concluded that Michelle had "ambivalent" feelings about her father, and did seem to fear him. Prior to the cessation of the visits, Michelle began to refer to her father as "Mike" although she had formerly called him "Dad."

In May, 1978, while still incarcerated, appellant filed a Petition for Writ of Habeas Corpus, seeking a resumption of visitation.

On June 15, 1978, Clearfield County Children's Services filed a petition seeking the termination of appellant's parental rights.

On January 4, 1979 a hearing was held on the parental termination and visitation petitions before the Honorable John K. Reilly, Jr., in the Court of Common Pleas of Clearfield County. Judge Reilly recused himself because he had sentenced appellant on the voluntary manslaughter conviction.

On May 16, 1979 another hearing on the petitions was held in the Clearfield County Court. The hearing was conducted by a specially appointed judge.

No order was entered following this hearing, but following disposition of Petitions for Review [2] and recusal filed by

1. Mr. Geppert is actually Michelle's step-grandfather.

2. Both Petitions for Review were denied by this court.

appellant's counsel, another brief hearing was held in June, 1981. An opinion was prepared by the lower court in February, 1982 in which the court explained its decision to terminate appellant's parental rights and deny his visitation petition. Orders effecting these decisions were entered on August 24, 1982 and this appeal followed.

■ The lower court terminated appellant's parental rights on the basis of Section 311(2) of the Adoption Act.[3] That section required that three things be shown before a natural parent's right in a child will be terminated: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be terminated. See *In Re Geiger,* 459 Pa. 636, 331 A.2d 172 (1975).

Our courts have recognized the severity of a termination of parental rights and have accordingly imposed strict standards of proof. See *In Re Adoption of R.I.,* 468 Pa. 287, 361 A.2d 294 (1976). The United States Supreme Court has held that in termination of parental rights cases, the moving party must prove its case by clear and convincing evidence. *Santosky v. Kramer, Commissioner, Ulster County Department of Social Services,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

In *Santosky, Id.,* the Supreme Court explained:

The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable

---

3. Act of July 24, 1970, P.L. 620, No. 208, § 311(2); P.S. § 311(2); 1 P.S. § 311(2); *repealed.* The present Adoption Act is the Act of Oct. 15, 1980, P.L. 934, No. 163 § 1, effective Jan. 1, 1981. The instant proceeding was commenced prior to the effective date of the new act and the parties have continued to proceed under the former law. See Comment to 23 Pa.C.S.A. § 2101.

destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than those resisting state intervention into ongoing family affairs. *Id.* at 753, 102 S.Ct. at 1394.

■ Our Supreme Court recently held that in all proceedings to involuntarily terminate parental rights, which are not yet final, the petitioner must prove the statutory criteria for that termination by clear and convincing evidence. *In Re T.R.*, 502 Pa. 165, 465 A.2d 642 (1983). The Court remanded the *T.R.* case for rehearing in accordance with the clear and convincing burden of proof. We do the same in the instant appeal, because we find that the lower court misapplied the burden of proof.

While the trial court opinion in this case suggests that it found the evidence "compelling" as required by *In Re R.I.*, *supra*, it is clear to us from a thorough reading of the opinion that the lower court did not place upon the petitioners the burden to prove their case by clear and convincing evidence.[4]

■ The trial court opinion indicates that aside from the question of which burden of proof should be utilized, the Court assessed the burden against appellant, rather than appellee. The Court suggested that the appellant had failed to show his mental capacity or financial ability to care for his daughter. We note most emphatically that it is not appellant's burden to show his capability, but rather, it is the burden of the petitioner who seeks the termination of his parental rights to show his incapacity. See *Santosky*, *supra*, *In Re T.R.*, *supra*.

As the trial court opinion notes, the evidence adduced at the hearing in this case shows that appellant has made

---

**4.** We are not unmindful of our earlier opinion in *In Re Gertrude Anderson*, 317 Pa.Super. 490, 464 A.2d 428 (1983) in which we found that "As a matter of legal construction looking to the plain meaning of the words, "compelling" evidence is at least as stringent a requirement as "convincing" evidence. Our holding today is based on the unique facts of this case.

efforts to see his daughter many times since the cessation of visitation. He has corresponded to this end with Clearfield County Child Welfare Services and has employed a psychologist to evaluate his daughter. Mr. Bartasavich has attempted to write to his daughter many times, but his letters have been returned to him. He has paid his daughter's elementary school tuition. Appellant attempted, while incarcerated, to provide some financial support to Michelle, but the Gepperts returned his checks to him. Mr. Bartasavich has written to his daughter's school seeking information about her and has asked for pictures of her.

Additionally, officers in charge of appellant during his incarceration verified his testimony that he was virtually unsupervised at the prison and that he would be recommended for parole.

Having noted the above recited findings, the trial court nonetheless terminated appellant's parental rights saying that appellant lacks the ability to satisfy Michelle's psychological and physical needs. Specifically the court found that appellant had been rendered incapable of parenting Michelle because he had killed her mother. The court also noted the lack of evidence of appellant's financial and occupational situation, implying incorrectly that appellant had the burden of proof..

Appellant's killing of his wife was certainly a tragic event, which has surely caused harm to Michelle. We are not prepared to conclude that it alone, however, meets the statutory requirements for termination of parental rights which were relied upon by the petitioner, Children's Services.

As outlined in *In Re Geiger, supra*, the incapacity must be repeated and continuous. Appellant's action was not repeated, although it could be argued that it is continuous in its effect.

The incapacity must have caused the child to be without essential parental care. Appellant's action certainly did cause Michelle to be without essential parental care.

The incapacity cannot be terminated. We cannot say based on the evidence before us that appellant's incapacity cannot be terminated. It is, of course true that because of appellant's action, Michelle will be permanently deprived of her mother's care. Her loss in this regard is complete and irretrievable. However, she may not be without essential parental care insofar as she may have available to her the care of her father. We do not agree with the trial court's conclusion that the permanence of the loss of her mother necessarily rendered appellant permanently incapable of parenting her.

We note that in a case factually identical to the one before us, the New Jersey Supreme Court found that the killing of a mother by a father was not alone sufficient to find that the father had abandoned his child. The Supreme Court in *In Re Adoption of J.*, 73 N.J. 68, 372 A.2d 607 (1977) reached its decision based substantially on the reasoning expressed in a dissenting opinion to the Superior Court decision in that case. The Superior Court had found that the father's parental rights should be terminated because of his killing of the child's mother. In a dissenting opinion, Judge Crahay noted "A child's relationship with a parent is of such moment that all doubts are to be resolved against its destruction." *In Re Adoption of J.*, 139 N.J.Super. 533, 354 A.2d 662 (1976) (Dissenting Opinion by Crahay, J.A.D.). We agree with Judge Crahay's observation and reiterate that the burden placed on those seeking a termination of parental rights is a heavy one.

The New Mexico Court of Appeals found abandonment in the killing of one parent by another in *In the Matter of the Adoption of John Doe*, 99 N.M. 278, 657 P.2d 134 (1982), but noted that abandonment would not be found only on the basis of the parent's incarceration for that crime. The court explained that other elements of importance include lack of parental affection, shown parental neglect and the failure to contribute financially to the child. None of these other elements is shown to be present in this case. Indeed, quite the contrary seems to have been the case.

■ We note that our review is of a record made in the spring of 1979. Three and one-half years have passed since then. Appellant has been paroled. Michelle has grown. We are unwilling to make any final determination on the basis of such an out of date record and we therefore remand for a new evidentiary hearing to be conducted in light of *Santosky, supra* and its progeny.

■ The hearing should be presided over by a judge other than the judge whose opinion is before us. While we recognize the difficulty of a case such as this, we note that the trial court enlarged the record before it beyond the evidence introduced by the parties. The Court relied upon a psychological report prepared by a psychologist for use in the criminal proceedings in which appellant was involved. The report had not been introduced in the instant proceedings. Particularly in a case in which the burden on petitioner is as stiff as it is here, we as a court should not enlarge upon that record. The judge should then recuse himself for much the same reasons as those of the first judge to hear evidence in this case who then recused himself because he had sentenced appellant.

We reverse the order which terminated appellant's parental rights. The order granting permanent custody to Clearfield County Child Welfare Service reversed. Custody was given to the Child Welfare Service in 1974 and must remain with them pending the outcome of further proceedings below.[5]

5. In this connection we note that it may well be the case, as Judge Crahay found it to be in *Adoption of J., supra,* that Michelle's best interests are served by her remaining in the custody of the grandparents. As Judge Crahay observed.

In this matter J's best interests are presently being served by the order giving her custody to plaintiffs as guardians. One may presume that those interests will not be lightly disturbed. They will be under the court's superintendence until, and if, some modification is ordered. All this can be done without doing violence to the principle that a child's significant relationship with its parents may be forever destroyed without compelling reasons.

On this record I would permit F to continue to be J's parent, albeit not her custodian. The future courses of matters such as

Due to the changed circumstances of the parties since the last hearing, a new evidentiary hearing is to be held on appellant's request for visitation. The visitation and termination of parental rights matters may be consolidated.[6]

Order terminating parental rights reversed.

Order denying visitation reversed.

Order granting permanent custody to Clearfield County Children's Services reversed.

Custody to remain with Clearfield County Child Welfare Services under the terms of the 1974 order. Case remanded for further proceedings consistent with this opinion.[7]

McEWEN, J., files a concurring and dissenting opinion.

McEWEN, Judge, concurring and dissenting:

Michelle Bartasavich was born on December 22, 1971, and was not yet three years of age when her natural father, Michael Bartasavich killed Mary Bartasavich, his wife and the mother of Michelle. Her maternal grandparents immediately assumed custody of Michelle and have since that time raised and cared for her as well as seen her grow to be, at the present time, a young lady of twelve years of age. The Clearfield County Child Welfare Service, a short time after the killing, provided for confirmation of this custody arrangement by completion of the formal placement procedure. Appellant, three months after the tragedy, acknowledged that the killing was intentional when he pleaded guilty to a charge of voluntary manslaughter for which he

these are not easily predicted. We should be slow to fix them unalterably.
*Adoption of J.,* at 548, 354 A.2d at 669.

6. We note that visitation has been limited or denied only where a parent has been shown to suffer severe mental or moral deficiencies that constituted a grave threat to the child. *In Re: Mary Lou Long,* 313 Pa.Super. 47, 459 A.2d 403 (1983) (citing cases).

7. We recognize that the issue of the proper scope of review applied in involuntary termination of parental rights cases is presently before our *en banc* Court in the case of *In Re: Adoption of James J.,* 2776 Phila., 81, argued February 11, 1983; however, the exercise of a different scope of review in this case would not affect the result.

was sentenced to a term of imprisonment of from five to ten years, a term from which he was released on parole in October of 1979, after five years of imprisonment. Michelle was taken by her grandparents, with the permission of the County Children's Services, to visit appellant in prison during 1975 and the first part of 1976. This practice halted, however, in 1976 when Michelle was still but four years of age as the visits caused her distress.

Three years later in May of 1978, appellant initiated formal proceedings in the Common Pleas Court in an effort to force the resumption of the visits, an effort that was shortly followed, in June of 1978, by a petition of the Clearfield County Children's Services to terminate his parental rights.

The opinion of the majority provides a very careful and persuasive rationale for each of its conclusions. I am of a mind, however, that the statute and decisions relating to termination of parental rights, including the decision of the United States Supreme Court in *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), were not drafted for application to this factual situation. Since I am not, therefore, compelled by either statute or decision and since it is perilous to proceed to a pronounciation of principle in this special situation, I consider only Michelle, now upon the threshold of womanhood, and conclude the wiser course in this case would cause entry of the following orders:

The permanent custody of Michelle shall remain in the Clearfield County Children's Services and in the maternal grandparents.

The order terminating parental rights is reversed without need to conduct further proceedings or to make further findings or conclusions or to enter further decree until and unless the circumstances reflected by the current record are substantially modified.

The Order denying visitation is reversed and the case remanded for the sole purpose of enabling the same hearing judge to personally confer with Michelle so that

her wishes, in view of her present age, with regard to the terms of visitation, if any, may be a controlling factor in the decision of the court regarding visitation; the efforts of the hearing judge to confer with Michelle for this purpose may be in the presence of other parties to and counsel in this litigation or may be in private provided, in any event, that all such conferences shall be upon the record.