501 A.2d 648

**In re ADOPTION OF M.J.H., a Minor.**

**Appeal of K.B.M. and G.M.**

Superior Court of Pennsylvania.

Argued May 14, 1985.

Filed Nov. 29, 1985.

66

John A. Knorr, Pittsburgh, for appellant.

Dennis D. Workman, Patrick T. Narcisi, Pittsburgh, for minor child.

Before SPAETH, President Judge, and ROWLEY and WIEAND, JJ.

SPAETH, President Judge:

This appeal is from an order sustaining exceptions to and vacating an order terminating appellee's parental rights. Appellee is the father of M.J.H., a girl born March 3, 1979. On October 6, 1979, while M.J.H. lay in the arms of her mother, S.H., appellee shot and killed S.H. On March 22, 1980, appellee was convicted of the first degree murder of S.H., and of recklessly endangering the life of M.J.H., and on May 27, 1981, he was sentenced to a life term in prison.[1] Appellants are M.J.H.'s maternal grandparents. On June 3, 1983, they petitioned to adopt M.J.H., and in connection with that petition sought to terminate appellee's parental rights on the grounds set forth in 23 Pa.C.S. § 2511(a)(1), (2) and (5). After hearing, the trial court entered an order terminating appellee's parental rights. On appellee's excep-

---

1. The sentencing court suspended sentence for reckless endangerment.

tions, the court en banc, one judge concurring in the result and the third judge, who had been the hearing judge, dissenting, concluded that grounds for termination had not been established. We reverse the order of the court en banc and reinstate the order terminating appellee's parental rights. While we agree with the court en banc that grounds for termination have not been established under 23 Pa.C.S. § 2511(a)(1) or (2),[2] we hold that by virtue of appellee's willful killing of S.H., and his consequent life imprisonment, grounds have been established under 23 Pa.C.S. § 2511(a)(2), which provide that parental rights may be terminated where the parent's "repeated and continual incapacity ... has caused the child to be without essential parental care, control or subsistence, necessary for his physical or mental well-being and the conditions and causes of the incapacity, ... cannot or will not be remedied by the parent."

Section 2511 of the Adoption Act, Act of October 15, 1980, P.L. 934, No. 163, 23 Pa.C.S. § 2511, provides in pertinent part:

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement

---

**2.** Appellants' argument that appellee's life sentence is the kind of court order contemplated by Section 2511(a)(5) is without merit.

with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a).

As the hearing judge and the court en banc recognized, parental rights may not be terminated under these provisions unless the evidence in support of termination is clear and convincing. *See Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re T.R.*, 502 Pa. 165, 465 A.2d 642 (1983). As an appellate court we are bound by the hearing judge's findings of fact when they have been approved by a court en banc to the same extent that we are bound by a jury's verdict. *Curtis v. Redevelopment Authority of City of Philadelphia*, 482 Pa. 58, 393 A.2d 377 (1978); *August Petroleum Co. 77B v. Casciola*, 303 Pa.Super. 374, 449 A.2d 735 (1982). Here, the court en banc did not disturb the facts as found by the hearing judge. Instead, taking the facts as found, the court reversed the judge's conclusions of law. Our task, therefore, is to examine the court en banc's application of law to the facts. If we conclude that the court's order is predicated upon an error of law, we may reverse. *Winpenny v. Winpenny*, 296 Pa.Super. 299, 442 A.2d 778 (1982).

The trial court held hearings on September 14 and October 12, 1983. The facts as developed at those hearings may be summarized as follows.

At the time of S.H.'s death M.J.H. was seven months old. Appellee and S.H. had been married for four years. Testimony of appellant G.M., the maternal grandmother, suggests that the marriage was a troubled one. About two months before M.J.H.'s birth, S.H. left the home she shared

with appellee to live with her parents because appellee had beaten her. N.T. 86–87, 155. Two weeks after M.J.H.'s birth, she returned home. N.T. 15. G.M. testified that appellee did not want M.J.H. N.T. 87.

Appellee was arrested and placed in the county jail the day after he killed S.H. N.T. 154. M.J.H. stayed with appellee's parents until December 1979, when appellee was released on bail. N.T. 174. Appellee then moved in with his parents, and until trial in March 1980 he cared for M.J.H. with the help of his mother. N.T. 155. He "changed her diapers, bathed her, fed her, changed her clothes ... bought her clothes." N.T. 146.

Meanwhile, appellants petitioned for M.J.H.'s custody, and in June 1980 the trial court awarded them custody, with appellee's parents awarded visitation for two days per month. N.T. 161, 174. While appellee was in the county jail, and later when he was imprisoned in the state penitentiary, his parents, at his request, took M.J.H. to visit him. While M.J.H. was staying with appellee's parents and appellee was in the county jail, the visits occurred about three times per week. N.T. 176. Later, when appellants gained custody, M.J.H. visited appellee in prison during her twice-monthly visits with his parents. *Id.* These visits continued until September 19, 1983, when the trial court ordered them to stop pending the outcome of these proceedings. In response to a question why he opposed appellants' adoption of M.J.H., appellee stated: "Because I want to keep my little girl, and someday I will be out and would like to raise her." N.T. 171.

Appellee testified, and his testimony was corroborated by the testimony of his parents and sister, that he sent cards and letters to M.J.H. in care of his family and letters to his family asking about M.J.H.'s welfare and that they purchase gifts for her from him. *See, e.g.,* N.T. 150, 165, 176, 181, 188. Appellee's mother testified that "[appellee] would write letters every week asking about [M.J.H.] and when she would go to visit him, they really got along good. He

played with her in the play area, and they had a good relationship." N.T. 176.

Appellant G.M. testified that while M.J.H. was staying at appellants' home, appellee did not communicate with M.J.H. N.T. 49, 68. Appellee testified that he did not do so because he never received any response from appellants.[3] Appellee testified that he had made four unsuccessful attempts to telephone M.J.H. at appellant's home. N.T. 150, 164.

Appellee provided no financial support for M.J.H. In explanation, he testified that he was able to earn from work in prison only $40 to $45 per month, which he spent for cosmetics and cigarettes. N.T. 151, 168, 169. He also testified that he had asked his family to keep track of the amounts they spent on M.J.H. so that he could repay them in the future. N.T. 176.

"It is the policy of this Commonwealth to preserve and protect the family whenever possible." *In re William L.,* 477 Pa. 322, 347, 383 A.2d 1228, 1240, *cert. denied sub. nom. Beatty v. Lycoming County Children's Services,* 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978). In recognition of the primacy and sanctity of the family, we said thirty years ago:

A family is an institution which preceded governments. Its sanctity was universally recognized before judges or statutes or constitutions or welfare organizations were known to man. The right of a child to a mother and a mother to a child are rights created by natural law. They are rights attributable to the nature of mankind rather than to the enactments of law.

It is a serious matter for the long arm of the state to reach into a home and snatch a child from its mother. It is a power which a government dedicated to freedom for the individual should exercise with extreme care, and only where the evidence clearly establishes its necessity.

*In re Rinker,* 180 Pa.Super. 143, 147–48, 117 A.2d 780, 783 (1955).

---

**3.** On one occasion appellee wrote appellants, asking them to visit him to discuss insurance. Appellants did, and M.J.H. accompanied them.

*And see Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965) ("Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, .... for as noble a purpose as any...."). Because the family occupies so important a place in our society, and terminating a parent's rights represents a destruction of the family, the Constitution requires that grounds for termination be proved by clear and convincing evidence. *Santosky v. Kramer, supra.* Nevertheless, when the evidence meets that standard, "the interest of the parent in keeping the child conflicts with the interest of the child in its essential physical and emotional needs and the Legislature has constitutionally mandated that the interests of the weaker party, the child, should prevail." *In re William L., supra,* 477 Pa. at 339, 383 A.2d at 1236.

### Have Grounds for Termination Been Proved Under Section 2511(a)(1)?

Appellants argue that "for a period of at least six months ... [appellee] failed to perform parental duties." 23 Pa. C.S. § 2511(a)(1). *See In re Adoption of McCray,* 460 Pa. 210, 215–16, n. 6, 331 A.2d 652, 655 n. 6 (1975) (unlike Adoption Act of 1925, Act of April 4, 1925, P.L. 127 § 1, which required both a settled purpose to relinquish *and* a failure to perform parental duties, under Adoption Act of 1970, Act of July 24, 1970, P.L. 620, § 311, 1 P.S. § 311, parental rights may be terminated upon proof of either ground).[4]

"Parental duties" have been defined as many sided: Pennsylvania law has recognized that not only is there a duty to love, protect and support one's child, *Wischman Adoption Case,* 428 Pa. 327, 331, 237 A.2d 205, 207 (1968), there is also a duty to maintain communication and association with that child. *See Appeal of B., supra;*

---

4. Section 2511(a)(1) of the Adoption Act of 1980, Act of October 15, 1980, P.L. 934, No. 163, is a reenactment of Section 311(1) of the Adoption Act of 1970.

*Jacono Adoption Case,* [426 Pa. 98, 231 A.2d 295] *supra;* and *In re Adoption of J.R.F.,* 27 *Somerset* L.J. [295] 298 (Pa.C.P.1972). Consequently, being a parent is more than a passive state of mind or a financial obligation; rather "it is an active occupation, calling for constant affirmative demonstration of parental love, protection and concern.... [A parent] must exert himself to take and maintain a place of importance in the child's life." *Appeal of B., supra,* 456 Pa. [429] at 333, 321 A.2d [618] at 620, quoting *In re Adoption of J.R.F.,* 27 Somerset L.J. at 304–305. Viewing the performance of parental duties as an affirmative obligation to perform a *composite* of "tasks," it becomes clear that dereliction of *one* responsibility, albeit a responsibility as important as support, may not under the particular circumstances warrant a complete termination of parental rights.

*In re Adoption of McAhren,* 460 Pa. 63, 71–72, 331 A.2d 419, 423 (1975) (emphasis in original).

The failure, for a six month period, to perform some, or even many, of the *"composite* of 'tasks' "* that parental duties comprise is therefore, without more, frequently insufficient to warrant destroying the parent-child relationship. Thus, the court will refuse to find abandonment when the child has been placed in the custody of others and the parent makes no contacts for more than six months, if the parent has used "all reasonable means available to preserve his parent-child relationship." *Matter of Kapcsos,* 468 Pa. 50, 61, 360 A.2d 174, 179 (1976). Similarly, a failure to provide financial support to one's children may not alone prove failure to perform parental duties. *See, e.g., Adoption of McAhern, supra* (father did not support children because mother thwarted his efforts to see them). In *In re Adoption of McCray, supra,* the Supreme Court stated:

[A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized

those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness "in declining to yield to obstacles" his rights may be forfeited. 460 Pa. at 216–17, 331 A.2d at 655, quoting *In re Adoption of J.F.R.*, 27 Somerset L.J. at 304) (footnotes omitted).

In *McCray*, the Court affirmed the termination of a father's parental rights under Section 2511(a)(1). The father had been incarcerated on several occasions, most recently for a term of five to ten years for armed robbery. During a four-year period the father sent the child one birthday card and a gift. He testified that his efforts to find her were thwarted by prison officials, but the record revealed that he had made only two attempts. In holding that the father had not performed "any parental duties", the Court noted that the father had not taken advantage of visitation rights or counselors and had not made "sincere or persistent efforts to locate or inquire about his daughter." 460 Pa. at 217, 218, 331 A.2d at 655, 656.

Appellants concede that incarceration alone is not sufficient to terminate parental rights under Section 2511(a)(1). They argue, however, that appellee's efforts to maintain a relationship with M.J.H. have not demonstrated the "reasonable firmness in declining to yield to obstacles" required by *Adoption of McCray, supra.* In support of this argument appellants point out that appellee has not telephoned or written to M.J.H. while she has been in their custody, and that neither has he provided for her support.

The record does not clearly disclose that appellants did not interfere with any efforts appellee may have made to communicate with M.J.H. at appellants' home, although it is clear that appellants did not approve of M.J.H.'s visits to the prison. N.T. 67, 80. Assuming, however, that appellants did not interfere, still, the record reveals that appellee wanted to visit M.J.H.; that M.J.H. went with appellee's parents to the prison at least twice monthly on a regular basis following appellee's incarceration and until such visits

were terminated by court order; and that appellee frequently asked his parents and sister about M.J.H.'s welfare, wrote to her in their care, and arranged for them to make purchases for her, for which he hoped to be able to repay them. While it is true that appellee has made no financial contribution to M.J.H.'s support, it seems apparent, and appellants made no effort to prove otherwise, that with earnings of only $40 to $45 per month, appellee was unable to provide support.

Appellants rely heavily upon *In re Adoption of McCray*, *supra*, but the facts of that case are significantly different. There, over a four-year period the incarcerated father made only two actual contacts and two additional attempts to communicate with his daughter. Here, appellee saw and corresponded with M.J.H. and inquired about her on a regular basis. It should also be noted that the burden of proof applied and approved in *McCray* was only a preponderance of the evidence.

Counsel for M.J.H., arguing for termination of appellee's parental rights, concedes that appellee "has attempted to discharge some of his parental duties through his parents," but argues that "given the fact [that appellee] is serving a life sentence this surrogate situation cannot reasonably be found to be temporary". Brief submitted on behalf of M.J.H. at 12. We have considered this argument carefully and acknowledge its force where, as here, the child has been in "temporary" care for five years. It should be noted, however, that M.J.H. is in the legal custody of appellants and that that custody, for practical purposes, is permanent. In addition, no case of which we are aware has held that a parent, forced by circumstances to rely on surrogates for the care of his children or to maintain contact with them has by reason of that fact alone demonstrated a failure to perform parental duties. As the Supreme Court has stated:

> We can conceive of no reason why the surrogate concept should not be equally applicable to the discharge of parental responsibilities of a parent who has lost custody

of the child involuntarily. Although a parent who does not have custody must express in a positive manner, her affection for the offspring and her interest in maintaining the parental relationship, it might well be under the circumstances of a given case that the use of a surrogate would be in the most feasible and effective means to accomplish that end.

*In re Adoption of P.*, 475 Pa. 197, 208, 380 A.2d 311, 316 (1977).

Also, the Supreme Court has declined to terminate the parental rights of a parent whose child has been in long-term foster care. *In re M.A.K.*, 489 Pa. 597, 414 A.2d 1052 (1980).

▌ When, as here, a child has been placed in the custody of others and the parent has made consistent efforts with the resources available to him "to take and maintain a place of importance in the child's life," *Adoption of McAhren, supra,* and has, with those resources, tried to take some responsibility for the *"composite* of 'tasks' "* associated with parenthood, *id.*, we are unable to say that the parent has failed to perform parental duties within the meaning of Section 2511(a)(1). We conclude, therefore, that the court en banc's reversal of the hearing judge's holding that appellee had failed to perform parental duties under Section 2511(a)(1) was justified.

### Have Grounds for Termination Been Proved Under Section 2511(a)(2)?

▌ Parental rights may be terminated under Section 2511(a)(2) if three conditions are met: "(1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Geiger*, 459 Pa. 636, 639, 331 A.2d 172, 174 (1975). Unlike Section 2511(a)(1), Section 2511(a)(2) does not emphasize the par-

ent's refusal or failure "to perform parental duties." Rather, its emphasis is on the child's present and future need for "essential parental care, control or subsistence necessary for his physical or mental well-being." As the Supreme Court stated in *In re William L., supra,* 477 Pa. at 331, 383 A.2d at 1232, "Section 311(2) is concerned only with the welfare of children whose essential needs have not been met, and whose parents cannot or will not meet those needs in the future." [5] *See In re R.I.,* 468 Pa. 287, 361 A.2d 294 (1976); *In re Geiger, supra.*[6] Under Section 2511(a)(2), the parents' interests in the continued relationship with their children are protected by the requirement that their parental rights may not be terminated unless it is proved that their incapacity "cannot or will not be remedied." *See, e.g., Bartasavich v. Mitchell,* 324 Pa.Super. 270, 471 A.2d 833 (1984); *In the Interest of C.M.E.,* 301 Pa.Super. 579, 448 A.2d 59 (1982). If, however, the parents' incapacity cannot be remedied, then, even though the parents demonstrate their love for the children and make sincere efforts to perform parental duties, their parental rights may be terminated.

*In re William L., supra,* demonstrates this proposition. There a mother had placed three of her children in foster care when she found herself unable to care for them. The mother was provided with nutrition aids to assist her in caring for her infant daughter, who remained in the home. Despite such assistance and her own efforts, the mother's skills as a parent did not improve. During visits in the mother's home with the three children who were in foster care, "havoc prevailed.... in which [the mother] chased one child after another attempting to keep them under control." *In re Williams L., supra,* 477 Pa. at 343, 383 A.2d at 1238. Psychological tests revealed that the mother's social skills and her ability to function independently were at the level

5. Section 2511(a)(2) of the Adoption Act of 1980 is a reenactment of Section 311(2) of the Adoption Act of 1970.

6. *See also* Joint State Government Commission, Official Comment, Adoption Act of 1970 (Section 311(2) "centers judicial inquiry upon the welfare of the child rather than the fault of the parent").

of a twelve year old. In addition, there was testimony that she had difficulty understanding housework, cooking and child care. In affirming the trial court's order terminating the mother's parental rights under Section 311(2) of the Adoption Act of 1970, the Supreme Court stated:

> The language of Section 311(2) should not, therefore, be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect, where, as here, disruption of the family has already occurred and there is no reasonable prospect for reuniting it without serious emotional harm to the child. In such circumstances, the issue is not whether the state should intrude to disrupt an on-going family relationship, but whether the state should seek to preserve in law a relationship that no longer exists in fact, . . . .

*In re William L., supra,* 477 Pa. at 348–49, 383 A.2d at 1241.

*See also In re R.I., supra* (mother unable to provide basic food and shelter despite efforts to improve her situation).

■ We believe that the present case, while of course different on its facts, is within the principle of *In re William L., supra.* M.J.H. is without essential parental care. For practical purposes, she has no parents, and her needs are being met by others. As the hearing judge aptly and succinctly described M.J.H.'s position: "The crime of first degree murder essentially deprived the child of both natural parents, resulting in the elimination of the mother and the continued incapacity of the father to provide essential parental care." Tr.Ct. Dissenting Slip op. at 7.

The court en banc cites two cases for the proposition that incarceration may not serve as the basis for finding parental incapacity under Section 2511(a)(2). In the first case, *Jones Appeal,* 449 Pa. 543, 297 A.2d 117 (1972), a mother pleaded guilty to aiding and abetting the rape, by her paramour, of her daughter and was sentenced to an indeterminate prison term of up to six years. On her appeal from an order terminating her parental rights to several of her

children under Section 311(2) of the Adoption Act of 1970, the Supreme Court reversed, stating: "Though the single act is egregiously offensive, it does not, in itself, meet the statutory standard of *continued abuse* necessary to support involuntary termination." 449 Pa. at 547, 297 A.2d at 119 (emphasis in original). In the second case, *Bartasavich v. Mitchell, supra,* this court reversed an order under Section 2511(a)(2) terminating the parental rights of a father who had pleaded guilty to voluntary manslaughter of his wife, the mother of the child in question. These cases, however, are inapposite.

In *Jones,* the mother's act did not result in the elimination of a parent for the children involved. Moreover, although it is not clear what the term of the mother's prison sentence was, it was of a short duration (up to six years), as compared with the life term that appellee is sentenced to serve. Thus, it could not be said in *Jones* as it can in this case that the parental incapacity cannot be remedied.

In *Bartasavich* the father's act did result in the death of a parent for the child involved. However, the father was convicted of voluntary manslaughter, not of first degree murder, and when we heard argument, he had been paroled, thus again, as in *Jones,* making it possible that the absence of parental care that the child suffered while the father was in prison would be remedied. It should also be noted that another ground for our reversal in *Bartasavich* was that the trial court had not used the clear and convincing evidence standard required by *Santosky v. Kramer, supra,* and, moreover, had "assessed the burden against [the father]", requiring him to prove his fitness as a parent. *Bartasavich v. Mitchell, supra,* 324 Pa.Superior Ct. at 275, 471 A.2d at 836.

In its opinion the court en banc states: "The record ... was replete with evidence of the father's capacity to be a parent, *viz.,* his care of the child before incarceration, his constant efforts since to do all he can to maintain the relationship within the constraints of his imprisonment, the petitioners' uncooperativeness, and his negligible earnings."

Tr.Ct. Slip op. at 7. We are unable to join in this appraisal. While, as we have discussed, the evidence cited by the court is sufficient under Section 2511(a)(1) to protect appellee's parental relationship with his child, it is not conclusive of the issue whether his parental rights may be terminated under Section 2511(a)(2). Section 2511(a)(2), focusing as it does on the needs of the child, requires us to examine, not the *fact* of a parent's incarceration, but its *effects* on the child. Here, appellee's willful killing of S.H. was in its consequences tantamount to a forfeiture, or perhaps more accurately, a throwing away, of his claim to family life and to being himself a parent to M.J.H.[7] By his act he left M.J.H. motherless and fatherless. His life imprisonment makes him incapable of providing M.J.H. with what she needs on a day-to-day basis, and this incapacity will not be remedied. Appellee's cards and letters, his frequent expressions of interest, do not provide for M.J.H.'s essential needs. A child's life does not come to a standstill when her mother is killed and while her father serves a life term in prison. We do not question the sincerity of appellee's desire to raise M.J.H., but his desire is unrealistic. M.J.H. will be an adult when appellee's prison term ends. We decline to "preserve in law a relationship which no longer exists in fact." *William L., supra.* M.J.H. should have the chance to belong to a family where she will be loved and cared for and where her essential needs will be met on a day-to-day basis, free of the worry that her relationship with her parents will again be disrupted. We are convinced

7. The court en banc suggests that the order terminating appellee's parental rights violated the Double Jeopardy Clause, Pa. Const. Article I, § 10 ("termination of parental rights ... would be a sentence added onto the sentence [of life imprisonment]"). Tr. ct. op. at 7. In his exceptions to the termination order, appellee did not argue double jeopardy; the issue therefore was not before the court en banc, and is not before us. *But see Helvering v. Mitchell,* 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938) ("Congress may impose both a criminal and a civil sanction in respect of the same act or omission; for the double jeopardy clause prohibits merely punishing twice, or attempting a second time to punish criminally, for the same offense.); *Commonwealth v. Brooks,* 330 Pa.Super. 355, 479 A.2d 589 (1984) (collecting cases).

that by our order, her "needs and welfare" may be met. 23 Pa.C.S. § 2511(b).

The order of the trial court is reversed and the order terminating appellee's parental rights is reinstated.