683 A.2d 911

**In the Matter of the ADOPTION OF C.A.W. and A.A.W.**

**Appeal of E.J.W., Jr., Natural Father.**

Superior Court of Pennsylvania.

Argued June 26, 1996.

Filed Oct. 10, 1996.

Michael J. Nies, Erie, for appellant.

Michael R. Cauley, Erie, for Children & Youth Services, participating party.

Before CAVANAUGH, JOHNSON and CERCONE, JJ.

JOHNSON, Judge.

On this appeal, we are asked once again to consider whether the parental rights of an incarcerated, natural father may be involuntarily terminated pursuant to Section 2511(a)(2) of the Adoption Act of 1980, 23 Pa.C.S. § 2511(a)(2). We find that the trial court properly based its order terminating parental rights upon clear and convincing evidence that the father's present and continued incapacity has caused his children to be without essential parental care, control and subsistence necessary for the children's physical or mental well-being and that the conditions and causes of the incapacity cannot be remedied by the father. We also conclude that, as mandated by Section 2511(b) of the Act, the trial court has properly given primary consideration to the needs and the welfare of the children. Accordingly, we affirm the order that terminated the natural father's parental rights.

E.W. ("Father"), the appellant herein, has a long history of criminal involvement beginning in 1984. In 1986, he was sentenced to 11½ to 23 months' incarceration in the Erie County Prison for corruption of minors. In early 1988, K.B.W. ("Mother") began living with Father. Mother and Father were married on March 31, 1989. C.A.W., born January 30, 1989, and A.A.W., born January 24, 1990, (sometimes referred to herein as "the Children") are the children of Mother and Father and are the subjects of this involuntary termination proceeding. In May 1993, while Father was incarcerated in the state penal system, the Erie County Office of Children and Youth ("OCY") received a report that the children in Mother's home were being abused. Mother was then living with a paramour, J.S., by whom she had two other children, boy S.S., born March 7, 1991, and girl S.S., born November 11, 1992. At the time of the report to OCY in May 1993, boy S.S., girl S.S., and the Children were all living with, and in the care of, Mother and J.S.

When OCY began contact with the family in May 1993, Father was in the penitentiary, having been convicted in 1992 of kidnapping, felonious restraint, rape, statutory rape, involuntary deviate sexual intercourse, indecent assault, terroristic threats, attempted involuntary deviate sexual intercourse, and aggravated indecent assault. These convictions all related to Father's criminal conduct involving a ten-year-old girl. His aggregate sentence on these convictions, computed from May 24, 1992, is 32 to 72 years' imprisonment at the State Correctional Institution at Pittsburgh. Prior to his arrest and incarceration on May 23, 1992, Father had been in the State Correctional Institution at Pittsburgh from August 7, 1989 to August 7, 1990 and at the State Correctional Institution at Mercer from November 1990 until August 7, 1991. N.T. dated April 3, 1995, at 64–65. Father was born January 10, 1968; he was twenty-seven years old at the time of the hearing on involuntary termination of his rights. *Id.* at 64.

As a result of OCY's initial investigations and continuing reports of child abuse, the court of common pleas issued an order on December 20, 1993, requiring that all four of the

children be medically evaluated. As a result of that evaluation, C.A.W. and A.A.W. were placed in foster care following a detention hearing on December 22, 1993. Because there was no evidence of abuse of the two children of Mother and J.S. (girl S.S. and boy S.S.), those children were returned to their parents' care. Adjudication proceedings on the Children were held before the Master in January 1994; Father was not present but was represented by counsel. The Master recommended that the Children be adjudicated dependent and found C.A.W. to be an abused child as defined by Section 3 of the Child Protective Services Law, now 23 Pa.C.S. § 6303. On March 3, 1994, the Children were adjudicated dependent.

A dispositional hearing was held before the Juvenile Court on April 25, 1994. Again, Father was not present but was represented by counsel. At the time of the dispositional hearing, the Children remained in foster care. They were receiving counseling at the Rape Crisis Center in Erie due to allegations that they had been sexually assaulted by J.S., Mother's current paramour. Both had been examined by a physician, Dr. Schober, who found physical evidence that A.A.W. had been sexually assaulted. Petition for Involuntary Termination of Parental Rights filed November 22, 1994, ¶ 11, at 4. C.A.W. had been evaluated by the Intermediate Unit and found to be developmentally delayed one to two years. She also displayed behavioral problems including inappropriate sexual behavior. A.A.W. exhibited similar behavioral problems. She attended the Sarah Reed Partial Program during this period to address these issues.

At the conclusion of the dispositional hearing, the Juvenile Court found that all reasonable efforts had been made to prevent placement, and that the Children's continuation in their home would be contrary to their welfare. It thus ordered that the Children be placed under the care and supervision of OCY for an indefinite period of time. It was further ordered that the Children be placed in an OCY foster home for a period not to exceed the next six month review hearing.

The review hearing was held on October 19, 1994. Father remained incarcerated but was represented by counsel at the hearing. Mother had decided to relinquish her parental rights to the Children voluntarily and, as a result, all visitation had been terminated. In a letter to the court dated September 12, 1994, Father had indicated that he did not want Mother to regain custody of the Children for at least another six months. At the conclusion of the review hearing, the court ordered that: (a) the Children remain under the care and supervision of OCY for an indefinite period with continued placement in foster care for a period not to exceed six months; (b) OCY was to follow through with Mother's intention to voluntarily relinquish her parental rights; (c) OCY was directed to pursue involuntary termination of Father's parental rights should he not agree to voluntary relinquishment; and (d) a treatment plan to pursue relinquishment of parental rights in regard to the Children was approved by the court.

On January 3, 1995, upon consideration of Mother's petition for voluntary relinquishment, a decree was entered transferring custody of the Children to OCY and terminating Mother's parental rights and duties. On March 2, 1995, an order was entered scheduling a hearing for April 3, 1995, on O.C.Y.'s petition seeking the involuntary termination of Father's parental rights. The court provided for Father's temporary release from the state penitentiary into the custody of the Erie County Sheriff and Father was transported to, attended, and testified at this hearing. On May 19, 1995, the Honorable John A. Bozza, P.J., made final the court's earlier order of April 11, 1995, which had granted, preliminarily, the petition for termination of Father's parental rights. Father now appeals.

Father advances a single issue for our consideration in his Statement of the Questions Involved:

A. Whether the termination of appellant's parental rights was against the weight of the evidence?

The termination decree was issued by the court of common pleas pursuant to 23 Pa.C.S. § 2511(a)(2), which provides for

termination of parental rights in cases where parental incapacity cannot be remedied. In pertinent part, Section 2511 provides:

**Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \* \* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \* \* \* \*

**(b) Other considerations.**—The court in terminating the rights of the parent shall give primary consideration to the needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

■■■■■ Our supreme court, speaking through Justice, now Chief Justice, John P. Flaherty, has recently set forth the scope of review and the burden of proof in involuntary termination cases:

"In cases where there has been an involuntary termination of parental rights by the Orphans' Court, the scope of appellate review is limited to the determination of whether the decree of termination is supported by competent evidence. It is established that, in a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by 'clear and convincing' evidence the existence of grounds for doing so."

*In re E.M.*, 533 Pa. 115, 120–21, 620 A.2d 481, 484 (1993) (citation omitted), quoting *Matter of Adoption of G.T.M.*, 506

Pa. 44, 46, 483 A.2d 1355, 1356 (1984). "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Matter of Sylvester*, 521 Pa. 300, 304, 555 A.2d 1202, 1203–1204 (1989). The grounds for termination of parental rights based on parental incapacity which cannot be remedied are not limited to affirmative misconduct. *In re E.M.*, *supra* at 120, 620 A.2d at 484. A parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties. *In re William L.*, 477 Pa. 322, 345, 383 A.2d 1228, 1239 *cert. denied*, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978).

■ Initially, we note that Father filed exceptions to the Preliminary Order on May 11, 1995, thirty days after the filing of that order. In Orphans' Court practice, exceptions shall be filed at such place and time as local rules shall prescribe. Orphans' Court Rules 7.1. The Local Rules of Erie County do not expressly provide for the filing of exceptions. Our Rules of Civil Procedure provide, in pertinent part:

Rule 227.1   POST–TRIAL RELIEF

\*     \*     \*     \*     \*     \*

(c) Post–Trial motions shall be filed within ten days after

\*     \*     \*     \*     \*     \*

(2) notice of nonsuit or the filing of the decision or adjudication in the case of a trial without jury or equity trial.

Here, however, the trial court did not enter a final order until May 19, 1995, stating that it had considered the exceptions filed by Father. The court chose to ignore the arguably untimely filing of the post-trial motions and addressed the merits of the alleged errors, albeit briefly. Since such consideration is permitted under Pa.R.C.P. 126 and does not affect the trial court's jurisdiction, we shall review the merits of this appeal. *Kurtas v. Kurtas*, 521 Pa. 105, 555 A.2d 804 (1989) (plurality opinion); *Commonwealth v. Campbell*, 425 Pa.Super. 514, 518, 625 A.2d 1215, 1217 (1993).

■ We turn now to the merits of Father's appeal. At the hearing on involuntary termination, the Children's caseworker testified to contacts she had with Father between December 1993 and November 1994. Father had sent numerous letters to the caseworker to be directed to Father's estranged wife, Mother. N.T., *supra*, at 32. One or two letters were directed to the caseworker regarding the Children and the upcoming hearing. Father sent the Children, in care of the caseworker, a check for $7.25 in May 1994 and a check for $5 in July 1994. *Id.* at 33. Both of these checks were sent by Father subsequent to the dispositional hearing on April 25, 1994, at which he had been represented by counsel. The checks were returned by the caseworker to Father, uncashed. The caseworker also testified to gifts sent to the Children by Father: magazines such as *Sesame Street* and *American Girl*, valentine cards in 1995, birthday cards in 1995, and one package containing a shirt and a small change purse.

Father testified that he never sent money to any individual for the use of his daughters other than the two checks returned by the caseworker. He also stated that he had sent perfume with little teddy bears to the Children from a company in West Hempstead, New York. Finally, Father testified to sending oversized Christmas cards to the Children in care of the caseworker in December 1994. By his own admission, Father spent very little time when not in a state institution living on any regular basis with C.A.W. and has never lived with A.A.W. on a regular basis. *Id.* at 66–67. Father testified to having five other children by three different women, all born between April 1982 and January 1994. Two of these children are the same two children, boy S.S. and girl S.S., understood to be the children of Mother and her paramour, J.S. *Id.* at 69–70. The last child claimed by Father was born January 2, 1994, *id.* at 71, some nineteen months after Father's last day of freedom outside the state correctional system.

Father contends that he has done what he could for his children based upon his circumstances. He argues that his sending of gifts and letters to the Children, coupled with his

attempts to send cash, demonstrates that he has never intended to relinquish his parental rights to his daughters. He submits that he has pursued the only avenues available to him. This argument, however, misses the mark. Were we called upon to consider whether Father had evidenced a settled purpose of relinquishing his parental claim to a child or had refused to perform his parental duties under Section 2511(a)(1) of the Adoption Act, his actions in sending gifts and writing letters would carry more weight. Here, however, the termination of parental rights is based upon the alleged continued incapacity of the parent that has caused the child to be without the essential parental care necessary for the child's physical or mental well-being, where that incapacity cannot or will not be remedied by the parent.

We focus, therefore, on those factors which relate to Father's alleged incapacity in determining whether the decree is supported by competent evidence. We recognize that, where the issue is not incapacity but abandonment, a parent's absence and/or failure to support due to incarceration is not conclusive. *In re Adoption of McCray,* 460 Pa. 210, 216, 331 A.2d 652, 655 (1975). Moreover, where a father, though imprisoned for life upon conviction of murder in connection with the child's mother, had made consistent efforts with the resources available to him to take and maintain a place of importance in the child's life, termination would not be warranted under Section 2511(a)(1) (abandonment). *In re Adoption of M.J.H.,* 348 Pa.Super. 65, 76, 501 A.2d 648, 651–54 (1985).

We emphasize that our concern, here, is with Father's alleged *incapacity.* As Judge Spaeth cogently observed in *Adoption of M.J.H.:*

> Section 2511(a)(2), focusing as it does on the needs of the child, requires us to examine, not the *fact* of a parent's incarceration, but its *effects* on the child.

*Id.* at 80, 501 A.2d at 656. On the issue of incapacity, we are guided by our supreme court's reasoning and decision in *In re William L.,* 477 Pa. 322, 383 A.2d 1228, *cert. denied,* 439 U.S.

880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978). In that case, the court was called upon to interpret Section 311(2) of the Adoption Act of 1970, of which Section 2511(a)(2), now before us, is a re-enactment.

In *William L.*, a mother placed three of her children in foster care when she found herself unable to care for them. The mother was provided with nutritional aids to assist her in caring for her infant daughter, who remained in the home. The mother's skills did not improve in spite of her best efforts and the assistance provided by the county Children's Services. Psychological tests indicated that the mother's social skills and her ability to function independently were at the level of a twelve year old. The mother had difficulty understanding housework, cooking, and child care. In affirming the trial court's order terminating the mother's parental rights under Section 311(2) of the 1970 Act, the Supreme Court declared:

> The language of Section 311(2) should not, therefore, be read to compel courts to ignore the child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect, where, as here, disruption of the family has already occurred and there is no reasonable prospect for reuniting it without serious emotional harm to the child. In such circumstances, the issue is not whether the state should intrude to disrupt an on-going family relationship, but whether the state should seek to preserve in law a relationship that no longer exists in fact, with the result that the child is consigned indefinitely to the limbo of foster care or the impersonal care of institutions.

*In re William L., supra,* at 348–49, 383 A.2d at 1241.

We recognize that in several cases involving incarceration, both our supreme court and this Court have declined to find parental incapacity under Section 2511(a)(2) and its predecessor based solely on incarceration. In *Jones Appeal,* 449 Pa. 543, 297 A.2d 117 (1972), a mother's parental rights had been terminated following her guilty plea for aiding and abetting the rape of her daughter, and the imposition of an indeterminate sentence of up to six years' imprisonment. In vacating

the order terminating parental rights, our supreme court held, *inter alia,* that the single act to which the mother had pleaded guilty, while egregiously offensive, did not in itself meet the statutory standard of continued abuse necessary to support involuntary termination. *Id.* at 547, 297 A.2d at 119. More importantly, however, the court found in *Jones* that the balance of the evidence against the mother was rooted in two written documents that were replete with hearsay and, therefore, were not competent evidence. *Id.* at 548–551, 297 A.2d at 120–21. The supreme court vacated the termination decree and remanded for proceedings at which the unreliable testimony would be excluded. *Id.* at 551–552, 297 A.2d at 122.

This Court has also reversed an order under Section 2511(a)(2) terminating the rights of a father who pleaded guilty to the voluntary manslaughter of his wife, the mother of the child in question. *Bartasavich v. Mitchell,* 324 Pa.Super. 270, 471 A.2d 833 (1984). The father in that case, however, had completed his minimum term of five years' incarceration and was on parole prior to the final hearing on the termination petition. The principle grounds for our reversal in *Bartasavich* were: (1) the need for the trial court to apply the clear and convincing evidence standard established in *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) and *In Re T.R.,* 502 Pa. 165, 465 A.2d 642 (1983); and (2) the trial court's improper placement of the burden to prove fitness as a parent on the father. *Bartasavich, supra,* at 275, 471 A.2d at 836.

As we indicated above, the burden of proof is upon the Erie County OCY to establish by clear and convincing evidence the present and continued incapacity of Father which has caused the Children to be without the essential parental care necessary for the Children's physical or mental well-being and that the condition of the incapacity cannot be remedied. *In re E.M., supra.* We conclude that this burden has been met. While the case now before us is different on its facts, it is within the principle of *In re William L., supra.* Mother has already voluntarily relinquished her parental rights, leaving the Children without essential parental care. Since the birth

of C.A.W. on January 30, 1989, Father has been out of prison only from February 1, 1989, to August 7, 1989, from August 7, 1990, to November 1990, and from August 7, 1991 to May 23, 1992, an aggregate period of less than nineteen months. His latest conviction has been affirmed by this Court, *Commonwealth v. [E.J.W., Jr.]*, 434 Pa.Super. 670, 640 A.2d 476 (1994) (table), as has his appeal from an order denying relief under the Post Conviction Relief Act. *Commonwealth v. [E.J.W., Jr.]*, 444 Pa.Super. 687, 663 A.2d 256 (1995) (table). No visitation with the Children has been sought by Father and, given his criminal record, including a 1986 conviction for corruption of minors and his present incarceration on numerous sex offenses against a ten-year old child, it is unlikely that such a petition would be granted. Father will not be eligible for parole until May 2024, when he will be fifty-six years old and the Children will be thirty-five and thirty-four, respectively. As Judge Spaeth observed in *In re Adoption of M.J.H., supra* at 80, 501 A.2d at 656, a child's life does not come to a standstill while the child's father serves an extended term in prison. Father's minimum term of thirty-two years' incarceration, of which twenty-eight remain to be served, when coupled with the nature of the crimes for which he has been twice incarcerated and the other circumstances of this case, makes him incapable of providing the Children with what they need on a day-to-day basis. This incapacity cannot and will not be remedied. *Id.*

We recognize that Father may not be held responsible for the alleged sexual abuse that has been visited upon at least one of the Children by Mother's present paramour. We focus instead on Father's conduct and the incapacity of Father resulting from his long-term incarceration for sexual abuse of a ten-year old.

From the evidence established in the hearing on termination, Father has no possibility of resuming contact with his children other than in a prison setting at any time during the Children's formative years. The reasons for his incarceration relate directly to abuses visited by Father upon a ten-year old child, and the major evidence of any attempts by Father to

manifest concern for the Children occurred after the filing of a petition for termination of parental rights. Moreover, the expert testimony presented supports a finding that Father has a present and continuing incapacity to provide essential care, control or subsistence necessary for the Children's physical or mental well-being. The requirements of Section 2511(a)(2) have been met.

We turn, now, to whether the trial court properly gave primary consideration to the needs and welfare of the children as required by Section 2511(b). Judicial inquiry is to be centered on the best interests of the Children, rather than the fault of the parent, but only after Father's incapacity has been proven by clear and convincing evidence. *In re Adoption of J.J.*, 511 Pa. 590, 607, 515 A.2d 883, 892 (1986); *In re Bowman*, 436 Pa.Super. 10, 13, 647 A.2d 217, 218 (1994). This Court has said, speaking through the Honorable Donald E. Wieand:

Courts are required not only to focus on the behavior of the parent but more importantly, are required to consider the effects of termination on the welfare of the children. The court must determine by a clear and convincing showing that termination of the parent-child relationship is in the best interest of the children.

The complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, carrying with it great emotional impact for the parent and children. Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the children's needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents'

rights would destroy something in existence that is necessary and beneficial.

*In re Bowman, supra,* at 13–14, 647 A.2d at 218–19 (citations omitted); *see also In re Adoption of A.S.H.,* 449 Pa.Super. 497, 674 A.2d 698 (1996) (best interest determination requires weighing of all factors which bear upon child's physical, intellectual, moral, and spiritual well-being).

On the question of the best interests of the children, OCY presented the testimony of Dr. Mary Anne Albaugh, board certified in both general and child psychiatry, with respect to the needs and status of A.A.W. Dr. Albaugh first came in contact with A.A.W. on April 5, 1994. N.T., *supra,* at 15. The child had entered the Sarah Reed early intervention preschool program where Dr. Albaugh was a consultant. *Id.* at 6. Dr. Albaugh testified to a number of difficulties which she observed in A.A.W. upon her first psychiatric evaluation. These included some speech and language delays; some significant behavioral and emotional disturbances including difficulties with head banging, and physically aggressive behaviors toward others; difficulty with tantrums, nightmares, and sleep disturbances; and inappropriate sexualized behaviors. *Id.* at 7. Dr. Albaugh determined that A.A.W. was struggling a great deal and would benefit from the early intervention program. *Id.* Dr. Albaugh testified that she became aware that A.A.W. was the victim of significant neglect, physical and sexual abuse, which disrupted her progress and development. *Id.* at 8. Dr. Albaugh's initial working diagnosis included post-traumatic stress disorder and concerns about major depression, with evolving significant anxiety difficulties. At the time of her testimony in April 1995, Dr. Albaugh's diagnosis was reactive attachment disorder of childhood. She also diagnosed A.A.W. with re-emerging symptoms of post-traumatic stress disorder, and she noted concern about attention deficit disorder and attention deficit hypertension disorder in this child's case. *Id.* at 9.

A.A.W.'s course of treatment was quite intensive. *Id.* at 10. It included numerous meetings, extensive collaborative work including treatment meetings, play therapy, and the enlist-

ment of mobile therapy into a foster care home. It also included the Sarah Reed preschool program itself and the use of psychotropic medications. When asked by counsel for OCY as to what kind of environment A.A.W. was going to need in the future, Dr. Albaugh testified as follows:

> She's going to need a very supportive, very nurturing, very consistent, an engaged, active family that's able to provide stability. Lots of support with transitions. Even from going from schooling to home kinds of transitions, which have been difficult with just a change in a bus driver. They need to be very consistent with a sense of permanency for her. And be willing to tolerate her tremendous difficulties with her lack of trust and difficulties in attachment.

*Id.* at 12. When asked for her opinion, within a reasonable degree of psychiatric certainty, as to the impact upon A.A.W. if her father were inserted, in some way, into her life at this point or in the relative near future, Dr. Albaugh stated:

> I do feel that for [A.A.W.] and from my perspective of what would be in the best interests of [A.A.W.], I think we could predict pretty reasonably that she would again experience regressive symptoms, that she would be quite anxious, she would have a great deal of difficulty in terms of how she would be able to understand and relate, and I do see it as traumatizing.

*Id.* at 14–15. Under cross-examination by court-appointed counsel for A.A.W., when asked:

> **Q.** In terms of your prognosis for A.A.W., could you tell us exactly how important it would be for her to have a steady and present parent figure?

Dr. Albaugh testified:

> **A.** It's paramount. It is one of the things that she needs.
>
> **Q.** And that ... parent figure needs to be able to take an active, involved part in her therapy, is that my understanding?

**A.** Yes.

*Id.* at 19–20.

A.A.W. needs a very supportive, very consistent, engaged, and active family that is able to provide stability. She will need an environment which manifests a sense of permanency given her reactive attachment disorder of childhood. Based upon the facts established through the hearing concerning Father's past conduct and present situation, Father's insertion into A.A.W.'s life would cause A.A.W. to again experience regressive symptoms, become quite anxious, and have a great deal of difficulty in understanding and relating to others. The record supports the conclusion that any contact between Father and A.A.W. would be traumatizing.

As to C.A.W., Reta Hull, the O.C.Y. caseworker who had direct contact with Father and the Children, testified that Father was not included in the family treatment plan and that Father, due to his incarceration, could neither aid the Children nor provide or care for them. *Id.* at 41. She testified that C.A.W. has been in a foster home since April 1994 and would be re-located to an adoptive home after completion of her kindergarten school year. The possible adoptive parents have had significant interaction with C.A.W. and their home is suitable for the child. The Children's caseworker determined that it was not in the best interests of the Children to receive communications from Father and the letters from Father were not forwarded to the Children. *Id.* at 42. She testified that neither child has any idea who Father is. *Id.* at 45.

The neglect and abuse which the Children received led to their adjudication as dependent in early 1994. Since that adjudication, the Children have been under the custody of OCY and have been receiving care and treatment for their disorders with a guarded prognosis. Both children will require intensive nurturing and uninterrupted support and care if their best interests are to be advanced. C.A.W. is now seven years old and A.A.W. is now six. Mother has already relinquished her parental rights. We conclude that if the Children are to have any opportunity to lead a normal life in a

normal environment, the order of Judge Bozza that terminated Father's parental rights must be affirmed. We find no error.

Order **AFFIRMED**.