J-S28031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.E., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 307 WDA 2023 |

Appeal from the Order Entered February 13, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court
Division at No(s):  CP-02-AP-0000117-2022

BEFORE:   PANELLA, P.J., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:            **FILED: September 29, 2023**

A.R. ("Mother"), appeals from the February 13, 2023 order granting the petition filed by the Allegheny Office of Children, Youth and Families ("OCYF") for the involuntary termination of her parental rights to her daughter, C.E. ("Child"), born in April of 2021.[1]  We affirm.

The certified record supports the following factual and procedural history set forth by the orphans' court.

> In June of 2021, Child was taken to Children's Hospital of Pittsburgh for concerns for possible failure to thrive and insufficient weight gain.  Mother was counseled about the concerns and a plan was implemented which included changing Child's formula.  (OCYF Exhibit 2 – CAC Consult).  OCYF did not become involved with the family at that time.  Approximately one

---

[*] Former Justice specially assigned to the Superior Court.

[1] The same order involuntarily terminated the parental rights of C.L.E. ("Father"), and he did not appeal.

month later, Mother brought Child back to Children's Hospital, reporting that she was vomiting frequently and was unusually fussy. (Id). Based upon Child's physical condition, a number of routine medical tests were administered. This testing revealed that Child had two healing rib fractures. Medical staff opined that the injuries were diagnostic physical child abuse, and Child was admitted to the Pediatric Intensive Care Unit. Mother was unable to give a plausible explanation for how the injuries occurred. As a result, a ChildLine report was made to the City of Pittsburgh Police and OCYF. (OCYF Exhibit 2-CAC Report). At the time of Child's admission to Children's Hospital, Mother presented with a black eye. When questioned about the injury, Mother reported that a former paramour had caused the injury. (Id). Mother later admitted that Father had caused the injury. (Tr. at 56-57).[2] OCYF became active with the family to address child abuse as well as for concerns for domestic violence. (Tr. at 40).

Child remained in the hospital for several days. In anticipation of her release, OCYF sought an emergency custody order on July 14, 2021. (Joint Stipulation B – Mother). Child was discharged from Children's Hospital on July 17, 2021 and placed in respite care. (Id). On July 19, 2021, Child was placed in the foster home of [K.M.]. Both Mother and biological Father were charged criminally for Child's injuries.

An adjudicatory hearing was held on September 21, 2021 and Child was found to be dependent. The court ordered Child to remain in her foster care placement. Mother was court ordered to participate in intimate partner violence (hereinafter "IPV") counseling, to address her criminal matters,[3] attend visitation, complete a forensic evaluation and follow all recommendations, to work with in-home services and to work with Achieva[, a parenting program,] when the service was available. (Joint Stipulation B – Mother) (OCYF Exhibit 7 – September 21, 2021 order).

In November and December of 2021, the court-appointed psychologist assigned to the family, Dr. Eric Bernstein, conducted

---

[2] The orphans' court cited to the notes of testimony from the February 10, 2023 termination hearing as "Tr."

[3] According to the OCYF caseworker, Mother was charged with endangering the welfare of the child, but "it actually pled down to . . . [s]ummary harassment and moved to non-traffic court." N.T., 2/10/23, at 51-52.

several evaluations. Mother underwent an individual psychological evaluation during this time and made several disclosures about IPV between herself and Father. She reported to Dr. Bernstein that Father had punched her with a closed fist, "choked her" a few times, struck her with some type of cord and prevented her from calling police during episodes of violence. (OCYF Exhibit 9 – 2021 Bernstein Report). Dr. Bernstein also conducted an interactional evaluation between Mother and Child. He reported that Mother did well with Child and provided her proper affection and attention. (Id). During this course of evaluations, Dr. Bernstein expressed concern for Child's physical safety given the domestic violence concerns between the parents and Father's poor parenting skills. (OCYF Exhibit 9 – 2021 Bernstein Report). He did report that he had no significant concerns about Mother's ability to parent and was hopeful that her continued participation in parenting classes would increase her knowledge as to Child's needs. (Id). Dr. Bernstein was in agreement with continued supervised visitation for Mother so long as she was compliant with OCYF. (Id).

The parties appeared for a permanency review hearing on April 14, 2022 and the court ordered Child to remain in her foster care placement. Mother was found to be in moderate compliance with the permanency plan and to have made moderate progress toward alleviating the circumstances which necessitated the original placement. During this time, Mother was attending coached parenting, had completed IPV treatment and was working with in-home services. The court continued to have concerns for IPV between the parents as Father had been charged criminally for assaulting Mother. The court ordered Mother to continue to work with in-home services and continue her mental health treatment. (OCYF Exhibit 7 – April 14, 2022 order).

The parties appeared on July 7, 2022 and the court ordered Child to remain in her foster care placement. Mother was found to be in a moderate compliance and to have made moderate progress.[FN1] (OCYF Exhibit 7 – July 7, 2022 order). The court ordered visitation to continue to be supervised. During this reporting period, the parents reported to their OCYF caseworker, Aryana Williams-Swanson, that they were no longer willing to work with services and ceased all contact with service providers. (Tr. at 49).

[FN1] The compliance and progress noted in the court order are not consistent with the court's findings in the rest of the court order or the testimony of the OCYF caseworker, Aryana Williams-Swanson. To the contrary, Mother refused to work with any services during this time. (Tr. at 49). The court believes that this may have been a scrivener's error. However, the order was not appealed.

OCYF filed a petition to involuntarily terminate Mother's parental rights on September 9, 2022. The parties appeared for a permanency review hearing on September 27, 2022. The court ordered Child to remain in foster care placement. Mother was found to be in minimal compliance and to have made minimal progress. The court ordered Mother to participate in a parenting program. (OCYF Exhibit 7 – September 27 2022 order). After the termination petition was filed, Mother reached out to the OCYF caseworker and expressed a willingness to engage with services again. (Tr. at 50).

Dr. Bernstein conducted several evaluations with the parents, Child and foster mother on December 20, 2022.

Orphans' Court Opinion, ("O.C.O."), 4/12/23, at 2-5 (cleaned up).

The subject proceeding occurred on February 10, 2023, at which time Child was twenty-two months old.[4] OCYF presented the testimony of Lisa Pfaff, the family's case manager for in-home services until September of 2022; Terraina Alexander, *via* video, Child's foster care coordinator at Wesley Family

_____

[4] Child was represented during the involuntary termination hearing by a guardian *ad litem* ("GAL") - counsel. Insomuch as Child's legal interests were incapable of ascertainment due to her young age, the court did not appoint separate legal counsel for Child. *See In re T.S.*, 648 Pa. 236, 257, 192 A.3d 1080, 1092-1093 (Pa. 2018) (holding, "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act" is satisfied). On appeal, the GAL filed a brief advocating in favor of the order involuntarily terminating Mother's parental rights.

Services; Aryana Williams-Swanson, OCYF caseworker; Tanya Marshall, the caseworker employed at Arsenal Family and Children Center who provided coached visitation for Mother; and Dr. Bernstein, the court-appointed licensed psychologist. Mother and Father testified on their own behalf.

By order dated February 10, 2023, and docketed on February 13, 2023, the orphans' court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Mother timely appealed on March 13, 2023, and she filed concurrently her concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1295(a)(2)(i) and (b). The orphans' court filed its Rule 1925(a) opinion on April 12, 2023.

On appeal, Mother presents the following two issues for review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(2), (5), and (8)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that [O]CYF met its burden of proving by clear and convincing evidence that the termination of Mother's parental rights would best to serve the needs and welfare of the child pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Mother's Brief at 6.

We consider Mother's issues in the context of determining whether the involuntary termination order is supported by competent evidence. *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *Interest*

- 5 -

*of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

Our Supreme Court has explained, "[a]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion," or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826–827 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123–24.

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act ("Act"), which requires a bifurcated analysis. 23 Pa.C.S.A. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under Section 2511(a). Only if the court determines that the petitioner established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which involves a child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

To involuntarily terminate parental rights, the petitioner must prove grounds under both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 359 (citation omitted).

In this case, the relevant provisions of the Act are Section 2511(a)(2) and (b),[5] which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any

---

[5] This Court need only agree with any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights. *See In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa.Super. 2019) (*en banc*) (citation omitted). Based on this disposition, we need not consider Mother's arguments with respect to Section 2511(a)(5) and (8).

efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct. We have explained, "[a] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties." *Matter of Adoption of C.A.W.*, 683 A.2d 911, 914–15 (Pa.Super. 1996) (citation omitted). Further, we have recognized that, under Section 2511(a)(2), a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa.Super. 2017) (citation omitted).

With respect to Section 2511(b), the court is required to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Regarding the "emotional needs and welfare" of the child, our precedent has interpreted it to include "intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation and quotation marks omitted).

Our Supreme Court in *In re E.M.*, 620 A.2d 481 (Pa. 1993), first recognized that the "emotional needs and welfare" analysis under Section 2511(b) should include, in part, the child's bond with his or her parent. In doing so, trial courts must examine the effect on the child of severing such a

bond, and this includes "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." ***In the Interest of K.T.***, 296 A.3d 1085, 1113 (Pa. 2023). The High Court recently explained:

> Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm. ***See E.M.***, 620 A.2d at 484 ("a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences").

***K.T.***, 296 A.3d at 1109-1110 (some citations omitted).

As such, the ***K.T.*** Court distinguished "extreme emotional consequences" from an "adverse impact" to the child when parental rights are terminated. ***Id.*** at 1111. Specifically, the Court cautioned that a trial court "must not truncate its analysis and preclude severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child." ***Id.*** at 1114. The Court concluded, "to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." ***Id.***

Moreover, in reiterating that the parental bond is only one part of the analysis, the ***K.T.*** Court held that the "Section 2511(b) inquiry must also include consideration . . . [of] certain evidence **if it is present in the record**." ***Id.*** at 1113, n.28 (emphasis in original). The specific evidence at

issue in *K.T.* related to the child's need for permanency and the length of time she had spent in foster care; the pre-adoptive nature of her foster home and the child's bond with foster parents; and whether the foster home met the child's developmental, physical, and emotional needs. *Id.* at 1112. The Court emphasized, however, that these foregoing factors were not an exhaustive list for consideration under all Section 2511(b) analyses. *Id.* at 1113, n.28. Rather, the *K.T.* Court found, as noted above, that the particular facts of each case determine the factors to be considered.

The Court recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109. For instance, if relevant in a case, a trial court "can equally emphasize the safety needs of the child" in its analysis under Section 2511(b). *See In re M.M.*, 106 A.3d 114, 118 (Pa.Super. 2014).

On appeal, Mother argues that the evidence was insufficient to prove that her conduct warranted termination under Section 2511(a)(2). Mother's Brief at 24. Specifically, Mother asserts that the court abused its discretion by finding that she did not complete her goals with respect to in-home services, IPV, parenting, and mental health or that she would not be able to complete them within a reasonable period of time. *Id.* at 25. We disagree.

The testimony of the OCYF caseworker, Ms. Williams-Swanson, reveals that Mother suffers from intellectual deficits, the extent of which is not specified in the record. Notes of Testimony ("N.T."), 2/10/23, at 62. As a result, the caseworker believed that Mother did not comprehend what was required of her under the permanency plan. *Id.* at 45. Further, Ms. Williams-Swanson testified that Mother "would seem receptive to the information" regarding the required services, "but she would end up not following through." *Id.* As such, the record reveals that Mother was inconsistent in complying with the services needed to reunify with Child. *Id.* at 90.

It is well-settled that Section 2511(a)(2) provides the statutory basis for "terminating involuntarily the rights of a parent with a physical or mental impairment." *In re Adoption of J.J.*, 515 A.2d 883, 893 (Pa. 1986). Our Supreme Court has emphasized, "the focus in such cases is the effect which an impairment has on the person's ability to provide parental care, not the mere fact of impairment. . . ." *Id.* In this case, ample evidence exists to support the termination of Mother's parental rights pursuant to Section 2511(a)(2).

For instance, because of her intellectual deficit, Mother was referred to the Office of Intellectual Disabilities. N.T. at 45. This service would have provided Mother with a service coordinator to assist her on a permanent basis, which was important because the in-home service she was involved with was offered temporarily. *Id.* at 12. However, Mother was inconsistent in her

engagement with the Office of Intellectual Disabilities. *Id.* at 10, 12. The court aptly explained:

> [Mother] suffers from intellectual deficits, and it was vitally important for her to be connected to services to address and overcome the challenges that accompany such deficits. Much of the concern for Mother related to her ability to understand the importance of complying with court-ordered goals. In-home services were implemented as a way to provide her with additional assistance for resources and service providers. The family was referred to work with these services in August of 2021. [Tr. at 6]. Lisa Pfaff was assigned to work with the family and assisted with several referrals to help the parents. She attempted to connect Mother with the Office of Intellectual Disabilities. (Tr. at 45). This office could have assigned [M]other a case manager or a service coordinator to assist with securing affordable housing, Social Security benefits and other valuable community resources. (Tr. at 46). Mother did not follow through with the referral for the Office of Intellectual Disabilities. (Tr. at 8). During her tenure with the family, Ms. Pfaff attempted to connect the parents with referrals for [IPV] counseling and mental health services. (Tr. at 7). Mother did not make herself available to meet with Ms. Pfaff on a regular basis and did not follow through with most of her referrals. (Tr. at 7, 8, and 11). Ultimately, in-home services closed out in July of 2022 for noncompliance. (Tr. at 13).

O.C.O. at 8-9. The testimony of Ms. Pfaff supports the court's findings. It is important to note that Mother and Father told both Ms. Pfaff and Ms. Williams-Swanson in approximately July of 2022, that they did not want to be involved with in-home services anymore. N.T. at 12-13, 72. The parents stated that they "wanted to get [Child] back on their own." *Id.* at 72. Ms. Williams-Swanson testified she explained to Mother and Father that their participation with in-home services was necessary to demonstrate they were capable of meeting Child's needs; however, they did not understand. *Id.*

The record also reveals that, despite Father's history of physically abusing Mother and her failure to provide a plausible explanation for Child's broken ribs that occurred at the outset of the dependency matter, she remained in a relationship with Father at the time of the hearing. Indeed, Mother testified that she intended to obtain housing with Father and raise Child with him. N.T. at 115.

The record supports the court's finding that, "despite Mother's successful completion of IPV classes, she hasn't made any meaningful progress in understanding the dynamic of the relationship with Father and the safety concerns that he poses." O.C.O. at 10 (citing N.T. at 57). Furthermore, the court found, "There has been little change in the nature of the relationship and there continues to be IPV incidents between the parents." *Id.* at 11 (citing N.T. at 58, 123). The court's finding is supported, in part, by Ms. Williams-Swanson's testimony that Father has acknowledged his own need for anger management. She testified that Father "often reports to me that he needs to get his anger under control." N.T. at 59-60. However, Father revealed in his testimony that he was not in mental health or anger management treatment. *Id.* at 128. As such, we discern no abuse of discretion by the court in concluding that Mother failed to satisfy her IPV goal.

With respect to Mother's parenting goal, the orphans' court found as follows.

> Mother did participate in two parenting programs. Initially, Mother was referred to a parenting program through the Achieva

program. She was unable to engage in that program due to a long wait list. Mother participated in a coached parenting program through Justice Works. (Tr. at 46-47). It was also court-ordered the Mother engage in a parenting program through the Arsenal program. Mother was initially resistant to this program but did begin in the fall of 2022. (Tr. at 47-48). At the time of the termination proceedings, Mother was on the verge of being discharged from Arsenal for inconsistent attendance. (Tr. at 100). The service providers reported that Mother had made progress in these programs and accepted redirection and suggestions. (Tr. at 96). Despite her participation in these programs, the court has concerns about Mother's parenting abilities. Mother has the capability to parent short-term and in a controlled environment but there is little evidence that she could independently care for her child. For these reasons, the court to did not find that Mother successfully completed this goal.

O.C.O. at 10. The court's conclusions are based on the following relevant findings:

> Mother lacks a basic understanding of Child's feeding needs. [Child] has dietary restrictions due to food allergies and also needs extra support to ensure that she is consuming enough food during meals. Mother has had to be reminded and redirected often to ensure that her child is eating enough to sustain her until her next meal. The visit supervisor, Terraina Alexander, reported concerns about Mother's lack of understanding about Child's food allergies, as Mother would often bring dairy products despite Child's intolerance to those items. (Tr. at 21).
>
> Child also suffers from developmental and physical delays and was recommended to participate in [physical and occupational] therapeutic services to address these issues. (Tr. at 74). Mother struggled to understand the need for these services. (Tr. at 23, 102). As reunification was the goal during the pendency of the case, Mother was given the opportunity to implement these services and engage in them. The services were initially scheduled to occur during Mother's visits, and she was expected to schedule and coordinate with these service providers. Unfortunately, Mother was inconsistent with scheduling despite being reminded to do so from various providers. (Tr. at 23). Ultimately, these services had to be moved into Child's daycare because Mother kept canceling appointments. (Tr. at 75). Aside

from Child's special needs, Mother was expected to attend Child's medical appointments so that she could meet her routine medical needs. (Tr. at 43). Mother did not consistently schedule, nor did she attend, Child's [routine] medical appointments. (Tr. at 35).

*Id.* at 9-10 (cleaned up). The foregoing findings are based on the testimony provided by Ms. Alexander, Ms. Williams-Swanson, and Ms. Marshall. Therefore, we discern no abuse of discretion by the court in determining Mother did not meet her parenting goal.

Regarding her mental health goal, the court found that Mother "was ordered to engage in mental health treatment at nearly every court hearing. However, she has never consistently done so and only attends medication management." O.C.O. at 9. Ms. William-Swanson's testimony supports these findings. Specifically, she testified that Mother's mental health goal required her to attend therapy which is different than medication management. N.T. at 44. Further, Ms. Pfaff testified that Mother never reengaged with mental health services. *Id.* at 9. The record amply supports the court's findings that Mother did not comply with this goal.

Based on the sustainable factual findings, we discern no abuse of discretion by the court in concluding that "Mother has failed to make progress in most all of her court-ordered goals either due to an incapacity to parent or her refusal to engage with services. The conditions and causes of the incapacity and refusal cannot or will not to be remedied by Mother." O.C.O. at 11 (cleaned up). Mother's first claim fails.

With respect to Section 2511(b), Mother argues that the evidence was insufficient to terminate her parental rights based on the testimony of Dr. Bernstein. Mother alleges that Dr. Bernstein observed her meeting Child's physical needs by changing her diaper, feeding her, and burping her. Mother's Brief at 29. In addition, Mother asserts that Dr. Bernstein testified that she was able to meet Child's emotional needs. *Id.* at 30. We discern no abuse of discretion.

Mother is correct that Dr. Bernstein observed her during the interactional evaluations as offering "her daughter attention and support and close supervision. I considered [Mother] to be responsible in supporting or attending to [C]hild's needs and [C]hild [was] responsive to the interaction as well." N.T. at 135-136. Nevertheless, Dr. Bernstein testified on cross-examination by Mother's counsel:

> Q. And both times [of your evaluations] did you observe a bond between [Child] and her mother?
>
> A. [T]he bond itself is not so much observed as it is understood as a culmination of not only the parent's level of investment but consistent participation in the child's life and familiarity with the child's needs and, of course, how they also interact.
>
> So I would alternatively suggest that **there was a positive interaction between Child and Mother**, **but the bond itself is measured by more than just the interactions alone**.

*Id.* at 149 (emphasis added). Indeed, the orphans' court measured the following considerations in concluding that Child's developmental, physical,

and emotional needs and welfare are served by the termination of Mother's

parental rights under Section 2511(b).

> The court would have serious concerns for the safety of Child if she were returned to Mother's care.  The most glaring concern is that Mother has never been able to explain the cause of the injuries that Child presented with at Children's Hospital in July of 2021.  (Tr. at 53).  Of equal concern is that Mother seemingly has no safety concerns as it relates to Father and does not believe he poses a safety risk to Child.  Father presented as easily frustrated and unable to complete basic parenting tasks such as diapering or changing Child's clothes.  Mother has long reported that Father does fine with Child and believed he could care for her independently.  Dr. Bernstein testified to this concern, noting that it was puzzling that Mother could not identify any areas in which Father needed improvement.  (Tr. at 140).  He went on to further opine that "either she's not critically assessing him, or she is protecting him in some way or another, but clearly there were some deficiencies and that she is not willing to acknowledge those raises concerns, especially placing him in the position to care for Child for any sustained period."  (Tr. at 140).  Based upon the prior incident of child abuse and Mother's lack of protective capacity, the court finds that Child would be at increased risk of child abuse if returned to Mother's care.

> Cases involving domestic violence always raise safety concerns for the children involved.  In addition to the physical safety of a child, domestic violence can have long-term ramifications on a child's functioning and development.   Dr. Bernstein reported that exposing a child to domestic violence could have a myriad of effects including psychological distress, anxiety, and could affect the child's mood, behavior, or aggressiveness.  (Tr. at 142). Mother has continued to engage in a relationship with Father and has downplayed incidents of physical violence. She has reported to being victimized by Father several times and as recently as July of 2022.   There has been no change in the status of the relationship between the parents and they remain an intact couple.  If Child were returned to Mother's care, she would be at increased risk for exposure to domestic violence.

> With respect to the bond/attachment analysis, the court does not find that Child has a necessary or secure attachment to Mother. Child recognizes Mother and does have a relationship with her but

does not view her as her psychological parent. (OCYF 8 – 2022 Bernstein Report). Child shares a loving bond with her foster mother and all of her needs are being met in the foster home. The foster care coordinator, Terraina Alexander, has reported that Child shares a bond with her foster mother. (Tr. at 27). Additionally, the OCYF caseworker testified that Child is doing "amazing" in the foster home. (Tr. at 74). Dr. Bernstein reported that the foster mother presented as "a stable, healthy, invested caretaker" and has provided Child with necessary love and care. (OCYF 8 – 2022 Bernstein Report).

He further opined that Child has relied on [her foster mother] as a "stable, consistent and loving support" and that Child's attachment to her foster mother is a secure one. (OCYF 8 – 2022 Bernstein Report); (Tr. at 153). The court acknowledges that Child may suffer some emotional discomfort or uncertainty if her relationship with Mother were to cease. However, Dr. Bernstein did not believe that it would "deleteriously affect" Child. (Id.)

O.C.O. at 12-13 (cleaned up).

The testimony of Ms. Williams-Swanson, Dr. Bernstein, and Ms. Alexander supports the court's findings. Specifically, with respect to Father's parenting deficiencies, Dr. Bernstein testified that, in the interactional evaluations he performed in November 2021, and again in December of 2022, he observed Father struggle "to engage, support, communicate with and attend to" Child. N.T. at 136. Further, he testified that "Father did not show a substantial or significant advancement in his anticipation of and response to his daughter's needs. [Child] [wa]s upset and in distress in both instances, and [Father] did not effectively calm her." *Id.* Dr. Bernstein testified that, "as long as [Mother and Father] are a couple and [Mother] relies on [Father] to coparent and raise the child, that too is of issue especially given [Father]'s notable struggles in both of the interviews and discussion [that took place

during his evaluations] as well as about his understanding of the child's needs and to the extent that he can meet those needs." *Id.* at 140.

Finally, concerning whether Child has a necessary and beneficial relationship with Mother, Dr. Bernstein testified that Mother has "a positive relationship with [C]hild but not to the level such that [C]hild depends upon [Mother] for her everyday needs." *Id.* at 144. As such, he opined that severing the relationship between Child and Mother would not rise "to the level of detrimental." *Id.* at 145. In contrast, Dr. Bernstein testified that Child relies upon her foster mother "for sustenance and her day-to-day needs." *Id.* at 145. He opined as follows regarding severance of the bond between Child and her foster mother.

> [Child] is approaching almost two years of age, which is a central part of development when separation anxiety is issue. That is, that the bond that has been established, and if a child . . . is apart for long from the caregiver to whom [he or she has] the attachment, it can lead to perhaps much more challenges or maladjustment than at any other age.
>
> It is a very sensitive period of [the child] life. So the point is that if separated from [her] foster mother, it could have substantial impact upon [Child] today.

*Id.* at 145-146.

Based on the foregoing sustainable findings of fact, we discern no abuse of discretion by the court in concluding that terminating Mother's parental rights serves the developmental, physical, and emotional needs and welfare of Child. Thus, we affirm the order pursuant to Section 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/29/2023