## In re Involuntary Termination of D.M.R.

*Christopher Spadoni,* for petitioner.
*Jeffrey Greenwald,* for respondent.
*Leonard Mellon,* for minor child.

MORAN, *J.*, March 17, 1989 — This matter comes before the court following a non-jury hearing held before the Honorable William F. Moran on February 12, 1988. A second hearing was held on December 30, 1988. Following the taking of testimony and transcription of the notes of testimony, the parties were granted leave to file briefs with the court. After a careful review of the testimony, we make the following

## FINDINGS OF FACT

(1) The minor child in this matter, D.M.R., was born on February 16, 1985.

(2) The natural mother of the minor child, D.M.R., is Lisa Retter.

(3) The natural father of the minor child, D.M.R., is John Rodriguez.

(4) The natural parents of the minor child, D.M.R., were not married at the time of conception or at any time subsequent to the birth of D.M.R.

(5) On October 21, 1986, Lisa Retter, the natural mother of the minor child, D.M.R., was murdered by the minor child's natural father, John Rodriguez.

(6) On March 9, 1987, John Rodriguez pled guilty to the murder of Lisa Retter. The plea was accepted for murder in the third degree. As a result of John Rodriguez's guilty plea, he received a sentence of imprisonment of not less than 10 years, nor more than 20 years to be served in a state correctional institution.

(7) At present, John Rodriguez is imprisoned in the state correctional institution located at Camp Hill, Pa.

(8) On October 21, 1986, Kathy Snyder, the maternal grandmother of the minor child, D.M.R.,

retrieved D.M.R. from Mr. and Mrs. Juan Rodriguez, the paternal grandparents of minor child D.M.R.

(9) In December 1986, Kathy Snyder obtained an order of the court granting her physical custody of the minor child, D.M.R.

(10) Kathy Snyder retained physical custody of the minor child, D.M.R., from October 21, 1986 through March 1, 1987.

(11) John Rodriguez knew that the minor child, D.M.R., was in the care and custody of Kathy Snyder from October 21, 1986 through March 1, 1987.

(12) During the period October 21, 1986 through March 1, 1987, John Rodriguez had no contact or communication of any nature, either directly or through third parties, with Kathy Snyder, concerning any matter, including the parenting of the minor child, D.M.R.

(13) From October 21, 1986 through March 1, 1987, John Rodriguez made no effort of any kind to contact or have communication with his daughter, the minor child, D.M.R.

(14) On March 1, 1987, physical custody of the minor child, D.M.R., was given by Kathy Snyder to her brother and sister-in-law, Douglas and Marcia Snyder, husband and wife.

(15) Douglas and Marcia Snyder, are respectively, the granduncle and grandaunt of the minor child, D.M.R.

(16) The minor child, D.M.R., has been in the exclusive physical custody of Douglas and Marcia Snyder from March 1, 1987 through the present time.

(17) On March 6, 1987, Douglas and Marcia Snyder obtained an order of this court transferring

physical custody of the minor child, D.M.R., from Kathy Snyder to them.

(18) At some point during 1987, John Rodriguez, the natural father of the minor child, D.M.R., came to learn that Douglas and Marcia Snyder had obtained custody of the minor child, D.M.R.

(19) From March 1, 1987 through late August or early September 1987, Douglas and Marcia Snyder did not receive any telephonic communication, financial support, information concerning parenting, counseling, or direction in regard to the upbringing of the minor child, D.M.R., from John Rodriguez, the natural father of the minor child.

(20) From March of 1987 through the early fall of 1987, John Rodriguez made no effort to contact or communicate with Douglas and Marcia Snyder or the minor child, D.M.R.

(21) John Rodriguez, the natural father of the minor child, D.M.R. did not have any contact with either D.M.R. or any adults who were her primary caretakers during the period from October 21, 1986 through late August or early September 1987.

(22) John Rodriguez's first attempt to contact D.M.R. since October 21, 1986, came in late August or early September 1987.

(23) Sometime in the late summer or early fall 1987, Douglas and Marcia Snyder received a card from John Rodriguez which was addressed to the minor child. The card stated "I love you and miss you, Love, Daddy."

(24) During the Christmas of 1987, Douglas and Marcia Snyder received two Christmas cards addressed to the minor child, D.M.R. from John Rodriguez, the natural father of the minor child.

(25) The three cards addressed to the minor child, D.M.R., did not contain any parenting instructions or directions regarding parenting, from

the natural father, John Rodriguez, with respect to the minor child, D.M.R.

(26) The minor child, D.M.R. was approximately 18 months of age when John Rodriguez sent the first greeting card in late August or early September 1987.

(27) The minor child, D.M.R. was approximately 21 months of age when John Rodriguez sent two Christmas cards in December 1987.

(28) Douglas and Marcia Snyder, from March 1, 1987 through February 12, 1988, did not receive any instructions or inquisition from any third party on behalf of John Rodriguez concerning their care and custody of the minor child.

(29) John Rodriguez's only effort to communicate with the minor child, D.M.R. has been three cards addressed to her. At no time has Mr. Rodriguez, either personally or through the use of surrogates on his behalf, contacted the minor child herself or any of the adults who were her primary caretakers.

## DISCUSSION

In this case, we are guided by the statute governing involuntary termination of parental rights.

23 Pa.C.S. §2511, in pertinent part, states as follows:

"(a) *General Rule* — The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

"(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

"(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care,

control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

"(b) *Other considerations* — The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent."

In the case at bar, petitioners have alleged that the natural father of D.M.R. has, by his conduct, relinquished his parental claim to D.M.R. because of his continued failure to perform parental duties. Additionally, the petitioners, Douglas and Marcia Snyder, have alleged that the 10- to 20- year period of incarceration John Rodriguez will serve evinces a repeated and continued incapacity of the natural parent, John Rodriguez, to provide the minor child with essential parental care.

It is undisputed that the petitioners bear the burden of proof in this matter and their burden is to provide clear and convincing evidence that the statutory elements exist before termination is possible. *In re Adoption of Sabrina,* 325 Pa. Super. 17, 472 A.2d 624 (1984), citing *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed. 2d 559 (1982). With this standard in mind, we now turn to the merits of the instant petition.

It is undisputed that the natural father, John Rodriguez, did not have *any* contact with the minor child, D.M.R., and failed to perform his parental responsibilities for a period in excess of six months. In fact, the only communication between John

Rodriguez and D.M.R. from October 21, 1986 through February 12, 1988, the date of the hearing on the instant matter, were three greeting cards addressed to D.M.R. It must be noted that at the time these cards were sent to D.M.R., the child was less than two years of age. Clearly, a child of such tender years is incapable of reading a greeting card. This "contact" by John Rodriguez is the equivalent of no contact with D.M.R. Since John Rodriguez did not have contact with D.M.R. for over six months, it would seem that this matter could be disposed of summarily. However, the added factor of John Rodriguez's incarceration for the murder of D.M.R.'s mother must be taken into account by this court in determining whether or not to terminate John Rodriguez's parental rights.

The law in the "novel" area of terminating the parental rights of an incarcerated parent is clear. The absence of a parent or failure of a parent to support a child due to incarceration is not conclusive on the issue of whether that parent has abandoned the child. *In re Adoption of McCrea,* 460 Pa. 210, 331 A.2d 652 (1975).

"However, a parent's responsibilities are not tolled during his or her incarceration; rather we must inquire whether the parent utilized those resources available while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, that parent's other rights may be forfeited. Therefore, although parental rights cannot be terminated based solely on the fact that a parent is incarcerated, that parent continues to have an affirmative duty to maintain [his] relationship with [his] child." *In re Adoption of Sabrina,* 325 Pa. Super. 17, 26, 472 A.2d 624, 628-9 (1984). (citation omitted)

The Pennsylvania Superior Court in the case of *In Interest of J.E.S.,* 365 Pa. Super. 291, 529 A.2d 514 (1987), affirmed a trial court order terminating the parental rights of an incarcerated parent. In *J.E.S.,* the appellant father was incarcerated on a sentence of three and one-half years to 10 years imprisonment following a conviction for a charge of sexual abuse. For a period of 18 months, the appellant sent his two children a total of no more than four letters. "He did not send them any cards or gifts, he did not contribute to their support, he did not call them on the telephone, and he contacted Children and Youth Services only once concerning his children shortly after he went to jail. In short, appellant exhibited no real interest in and concern for the welfare of his children." *In Interest of J.E.S.* at 293, 529 A.2d at 515.

It is clear that the inaction of John Rodriguez in regard to his parental duties is similar to the inaction of the appellant in *J.E.S.*.

Respondent, John Rodriguez, states that this court must look to his exhibition of parental concern within the framework of the surrounding circumstances. It is contended by Mr. Rodriguez that by not contacting D.M.R., either personally or through surrogates, he has shown parental concern because of the unique situation concerning not only his incarceration but the death of D.M.R.'s mother. However, our interpretation of parental concern differs from Mr. Rodriguez's interpretation.

"Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance. This

affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life." *In re Burns,* 474 Pa. 615, 624-5, 379 A.2d 535, 540 (1977).

A careful review of the evidence clearly indicates that John Rodriguez did not have contact with the minor child, D.M.R., for a period in excess of six months. From the beginning of the period Mr. Rodriguez has been incarcerated, he has not exerted himself in an effort to utilize any of the available resources to preserve his parental relationship and "maintain a place of importance in the child's life." While the court is mindful of the fact that an incarcerated prisoner does not have all of the liberties and opportunities available to a parent in more normal circumstances, we are also mindful that Mr. Rodriguez has not attempted to overcome any of the obstacles in order to maintain a parental relationship with D.M.R.

Mr. Rodriguez posits the theory that any attempt(s) to contact the various custodians of D.M.R. during his period of incarceration would have been met with disapproval. While this may be true, Mr. Rodriguez's relationship with the custodial caretakers of D.M.R. is secondary to his relationship with D.M.R. Mr. Rodriguez has not exhibited any affirmative effort to perform his duty as a parent. His decision to sit back and allow D.M.R.'s life to continue without his intervention for almost one year is not explained away by the claim that he did not want to "make things worse." Simply stated, Mr. Rodriguez's relationship with Kathy Snyder or

Douglas and Marcia Snyder is not the relationship that is at issue. It is clear that John Rodriguez has consistently failed to perform his parental duties during the period October 21, 1986 through February 12, 1988. It cannot be said that three greeting cards addressed to a child less than two years old exhibits any significant or meaningful parental care.

Additionally, we note that 23 Pa.C.S. §2511(b) states that the court shall give primary consideration to the needs and welfare of the child. By all accounts D.M.R. is being well cared for by Douglas and Marcia Snyder. Further, it is not disputed that John Rodriguez murdered the natural mother of D.M.R. It is difficult for this court to believe that D.M.R.'s needs and welfare are served by leaving her in limbo for at least eight years awaiting the possible, but not definite, release from prison of her father who readily admits to murdering her mother. This court believes that the best interests of D.M.R. are served by terminating the parental rights of her natural father, John Rodriguez. The termination of the parental rights of John Rodriguez will permit the legal adoption of D.M.R. by the only real parents that D.M.R. has known, Douglas and Marcia Snyder.

As previously stated, our decision to terminate the parental rights of John Rodriguez is based upon 23 Pa.C.S. §2511(a) (1). However, the petitioners also raise, as an alternative ground for terminating the parental rights of John Rodriguez, section 2511(a) (2) which provides for the termination of parental rights upon a finding of the repeated and continued incapacity of a parent which has caused the child to be without essential parental care necessary for the physical and mental well-being of that child.

We note that the Pennsylvania Superior Court in the case of *In re Adoption of M.J.H.,* 348 Pa. Super. 65, 501 A.2d 648 (1985) affirmed the trial court's order terminating the parental rights of a father who had murdered his children's mother. The *M.J.H.* case is virtually on all fours with the case at bar. The only significant difference in the case at bar is that John Rodriguez received a 10- to 20- year sentence while the appellant in *M.J.H.* received a sentence of life imprisonment. The Superior Court, in *M.J.H.,* noted that *M.J.H.* would be an adult when the appellee's prison term ended. The Superior Court stated that "we decline to preserve in law a relationship which no longer exists in fact." *In re Adoption of M.J.H.* at 80, 501 A.2d at 656. However, while John Rodriguez in all likelihood will not be in prison as long as the appellant in *M.J.H.,* the Pennsylvania Superior Court has affirmed the termination of parental rights based upon the parent receiving a prison sentence of five to 10 years stating that the appellant would not have any meaningful and significant contact with the children. *In re Stickler,* 356 Pa. Super. 56, 514 A.2d 140 (1986). While our decision to terminate Mr. Rodriguez' parental rights is not based upon section 2511(a)(2), the case law would support such a determination based upon his lengthy prison sentence.

Wherefore, we enter the following

## DECREE

And now, March 17, 1989, the petition of Douglas and Marcia Snyder is granted and the parental rights of John Rodriguez in the minor child, D.M.R., are hereby terminated.