J-S17030-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

IN RE: J.J.H., A MINOR

APPEAL OF: J.W., FATHER

: IN THE SUPERIOR COURT OF
:        PENNSYLVANIA
:
:
:
:
:
:
:
:
:
: No. 3261 EDA 2024

Appeal from the Decree Entered November 12, 2024
In the Court of Common Pleas of Delaware County Orphans' Court at
No(s): 0039-2024-A

IN RE: A.J.H., A MINOR

APPEAL OF: J.W., FATHER

: IN THE SUPERIOR COURT OF
:        PENNSYLVANIA
:
:
:
:
:
:
:
:
:
: No. 3262 EDA 2024

Appeal from the Decree Entered November 12, 2024
In the Court of Common Pleas of Delaware County Orphans' Court at
No(s): 0025-2023-A

BEFORE:  MURRAY, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED JULY 8, 2025**

J.W. ("Father") appeals from the decrees terminating his parental rights

to J.J.H. and A.J.H. Father's counsel has submitted an ***Anders***[1] brief and

---

[1] ***See Anders v. California***, 386 U.S. 738 (1967); ***see also In re V.E.***, 611 A.2d 1267, 1275 (Pa.Super. 1992) (extending ***Anders*** to appeals by indigent parents represented by court-appointed counsel in involuntary termination matters).

application for leave to withdraw. We affirm the decrees terminating Father's parental rights and grant counsel leave to withdraw.

Father is the biological father of A.J.H. and putative father of J.J.H. Both children were adjudicated dependent in January 2019, while they were residing with their biological mother ("Mother"). Two months later, in March 2019, Mother signed voluntary placement agreements for the children, and the court transferred their legal and physical custody to Delaware County Children and Youth Services ("CYS").

Over four years later, on April 24, 2023, CYS filed a petition for the involuntary termination of Father's parental rights to A.J.H. About one year after that, on April 22, 2024, CYS petitioned for involuntary termination of Father's parental rights to J.J.H. The court held a hearing on both petitions on October 31, 2024.[2] At the time, A.J.H. was almost six years old, and J.J.H. was 10 years old.

CYS presented the testimony of the CYS caseworker, whom the parties stipulated was an expert in the field of social work. N.T., 10/31/24, at 36-37. She testified that Mother agreed to place the children with CYS. CYS identified concerns about mental health and substance use, lack of safe and stable housing, and the absence of parental care and control. *Id.* at 13, 40. CYS did not consider Father a resource for the children at that time due to a "lack of

_____

[2] The hearing was also regarding the termination of Mother's parental rights to J.J.H. Mother had previously voluntarily relinquished her parental rights to A.J.H.

proper parental care and control and safe and stable housing." ***Id.*** at 41; ***see also id.*** at 40 (CYS did not place the children with Father "due to his work schedule and his housing situation"). While Father participated in a dependency hearing in March 2019, he did not present himself as a resource for the children. ***Id.*** at 41.

The caseworker testified that after the children were placed with CYS, Father was not compliant with their directives:

> [Father] had sporadic contact with [CYS]. He would not case plan. He would not provide a plan for the children. He would obtain stable – he would obtain housing and then he would not have housing. He would lose his housing and then he would obtain housing again and then he would lose his housing. He was not consistent with visitation or participating in our visitation programs. He would not comply with providing employment records as well as childcare – childcare plans if the children were to return to him. He was not complaint at all with [CYS].

***Id.*** at 46. At the permanency review hearings in 2019 and 2020, Father was found to have no or minimal compliance with his case plan and no or minimal progress with his case plan. ***Id.*** at 48-49.

The caseworker testified that in the summer of 2021, Father was more cooperative with CYS and was participating in unsupervised weekend visits with the children. ***Id.*** at 47, 49. From then through October 2022, Father was consistently visiting with the children and had full or moderate compliance with his case plan and made moderate to minimal progress. ***Id.*** at 49-51. However, Father still failed to provide employment records or a written childcare plan. ***Id.*** at 47, 50.

Two months later, in December 2022, because Father had become inconsistent with visitation, Father's visits were decreased to one unsupervised weekend per month. *Id.* at 47-48; *see also id.* at 64. Father only participated in one weekend visit over the next three months, and his visits were thereafter decreased to supervised visits once a week. *Id.* at 47-48. Father also refused to allow CYS to visit his home. *Id.* By March 2023, Father was found to have no compliance and no progress with his case plan. *Id.* at 51. Father was not visiting the children, did not have stable housing, and would not provide a written childcare plan or employment records. *Id.* at 51-52.

Father did not visit his children between his final weekend visit in December 2022 and a supervised visit in June 2023. *Id.* at 73. Father was found to have minimal compliance and no progress with his case plan in August 2023. *Id.* at 52. In September 2023, Father missed two supervised visits and was discharged from the visitation program. CYS referred the case to a different visitation program. *Id.* at 53, 72. At that time, Father was inconsistent with maintaining contact with CYS and did not have stable housing. *Id.* at 53. He was found to have minimal compliance and no progress with his case plan in January 2024 and May 2024. *Id.* at 52-54, 74. Father's final visit with A.J.H was in February 2024, and his final visit with J.J.H. was in April 2024. *Id.* at 54.

The caseworker testified that when CYS filed the termination petitions in April 2023 and April 2024, Father's issues remained his failure to establish

"[p]arental care and control as well as failing to comply with [CYS], failing to maintain regular contact with [CYS], failing to successfully maintain contact with his children, failing to make himself available for reunification services offered, and safe and stable housing." *Id.* at 57. The caseworker testified that at the time of the termination hearing, in October 2024, Father had not established stable housing. *Id.* at 57. She said that Father had given CYS his current address approximately a year before the hearing, but that CYS never requested access to that residence because Father had not had a case plan meeting or provided a written childcare plan. *Id.* at 69. She testified Father has never parented the children full-time. *Id.* at 63. The caseworker stated that she did not believe Father could provide the physical and emotional support the children need. *Id.* at 66.

The caseworker stated that she witnessed one or two visits between Father and the children, before they switched visitation programs. *Id.* at 60. A.J.H. would cry and scream because she did not want to attend the visits. *Id.* at 60. J.J.H. would use Father's cell phone, and there was not much interaction or conversation between Father and the children. *Id.* at 60, 61. Once they switched visitation programs, A.J.H. refused to visit Father. *Id.* at 55. Both children ultimately told the caseworker that they did not feel safe visiting Father and only participated to please him. *Id.* The caseworker testified that the children do not have a beneficial relationship with Father, and she does not believe severing the relationship would be detrimental to them. *Id.* at 65.

Meanwhile, in October and November 2023, the children were placed with their current foster parents ("Foster Parents"), who have adopted the children's biological brother. *Id.* at 17-18, 61, 64. The caseworker testified that since being placed with Foster Parents, both children "have really come out of their shell[s] and they've been very comfortably in their current foster home." *Id.* at 61. The children look to Foster Parents for safe care and "for everything for the needs to be met." *Id.* at 64. The caseworker testified the children have a "very caring, bonded relationship" with Foster Parents. *Id.* at 65.

She further testified that J.J.H. "has been thriving." *Id.* at 17-18. J.J.H. receives occupational therapy and has an individualized education program. *Id.* at 66. She refers to both Foster Parents as "mom." *Id.* at 18. While J.J.H. used to maintain she wanted to reunite with Father, before she moved to the foster home, she has now decided that she wants to stay with Foster Parents and be adopted. *Id.* at 17-18, 62-63. J.J.H. does not ask the caseworker about Father. *Id.* at 62.

A.J.H. has been diagnosed with post-traumatic stress disorder. *Id.* She receives play therapy, occupational therapy, physical therapy, speech therapy, and has an intervention plan. *Id.* at 66. Like J.J.H., A.J.H. looks to Foster Parents as her parents. *Id.* at 63. A.J.H. does not want to visit Father, and "meltdowns if you talk about her dad." *Id.* The caseworker testified that termination of Father's parental rights and adoption by her Foster Parents

would be in both children's best interest. *Id.* at 65-66, 67; *see also id.* at 18-19.

Father testified that he lives on the bottom floor of his aunt's duplex, and that his aunt would be able to help him care for the children if he was given custody. *Id.* at 91. He testified that CYS has visited each of his homes except for his current one. *Id.* at 101, 102. He stated that for years, the children came to his house on the weekends. *Id.* at 93. Father testified he attended every visit at the latter visitation program, and was told the visits were terminated because there was no transportation for the children. *Id.* at 92, 107. He stated he obtained a parenting certificate and provided CYS with his written parenting plan. *Id.* at 93, 94. He said CYS knows he has worked as a local truck driver for 20 years. *Id.* at 93. For the past two years, Father has been painting for Boeing. *Id.* at 97. He asserted he provided CYS with his paystubs, in addition to his lease and his car insurance. *Id.* at 94. He said he complied with all CYS's requests, but "the more [he] did the harder it got and the more they kept pushing the goal posts back." *Id.* at 93. He testified that he loves the children and has been ready to assume their custody "since day one." *Id.* at 94. Father stated that he was in Louisiana when Mother surrendered custody of the children, and by the time he returned to the area, CYS "already had them." *Id.* at 95. Father also presented the testimony of a relative who offered to be a resource for the children.

Counsel for A.J.H., who is also the guardian *ad litem* ("GAL") for both children, asserted that it is both in A.J.H.'s best interest and legal interest to

have Father's parental rights terminated so that she can be adopted by Foster Parents. *Id.* at 130-31. She stated that A.J.H. has been in foster care since she was a few months old, and views Foster Parents as her parents. *Id.* at 131. She also stated she believed termination was in J.J.H.'s best interest. *Id.* at 5, 132. The GAL/counsel stated that previously, J.J.H. wanted to return to Father, but that over the course of the past year and a half, J.J.H. changed her mind and now wants to be adopted by Foster Parents. *Id.* at 4-5, 131.

Counsel for J.J.H. asserted that J.J.H. "emphatically" wants to remain with Foster Parents. *Id.* at 132.

The court entered decrees terminating Father's parental rights to both children under Sections 2511(a)(1), (2), (5), (8), and (b).[3] Father appealed. We consolidated the appeals *sua sponte*.

As stated above, Counsel has filed an **Anders** brief and application/petition for leave to withdraw. We must assess the adequacy of Counsel's withdrawal request before we reach the merits of the appeal. **In re Adoption of B.G.S.**, 240 A.3d 658, 661 (Pa.Super. 2020). Counsel seeking to withdraw must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous;
>
> 2) furnish a copy of the [**Anders**] brief to the [appellant]; and

_____

[3] The court also terminated Mother's parental rights to J.J.H.

3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Id.* (quoting ***Commonwealth v. Cartrette***, 83 A.3d 1030, 1032 (Pa.Super. 2013) (*en banc*)) (formatting altered; alterations in original). The ***Anders*** brief must:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Id.* (quoting ***Commonwealth v. Santiago***, 978 A.2d 349, 361 (Pa. 2009)).

In accordance with the foregoing, counsel has petitioned the Court for leave to withdraw on the basis that she believes the appeal is frivolous. She states she has "has conscientiously and thoroughly reviewed the record of the proceedings in this matter to include the transcript, the Judicial Opinion, as well as [her] own notes from the proceedings." Application/Petition for Leave to Withdraw, 3/12/25, at ¶ 5. Counsel has attached a copy of the letter she mailed and e-mailed to Father, advising him of his right to proceed *pro se* or through new counsel and to raise additional points to this Court. The letter indicates counsel enclosed a copy of the ***Anders*** brief. The ***Anders*** brief provides a summary of the factual and procedural history of the case and identifies two potential issues for appeal. Counsel outlines the applicable law,

Father's argument, and her conclusion why the appeal is frivolous. To date, Father has not responded to the letter and **Anders** brief.

Counsel has satisfied the requirements for petitioning this Court for leave to withdraw. We will therefore "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." **B.G.S.**, 240 A.3d at 662 (quoting **Commonwealth v. Flowers**, 113 A.3d 1246, 1250 (Pa.Super. 2015)).

We will begin by addressing the two issues identified by counsel:

1. Did the trial court abuse its discretion in terminating Father's parental rights without adequately considering evidence of [F]ather's prior history of compliance and progress?

2. Did the trial court abuse its discretion in terminating Father's parental rights without considering [CYS's] admission that it was not working toward reunification and therefore not providing reasonable efforts to Father?

**Anders** Br. at 5 (answers omitted).[4] Counsel for CYS, counsel for J.J.H., and the GAL/counsel for A.J.H. have submitted letters stating they will not be filing briefs.

Involuntary termination of parental rights is governed by Section 2511 of the Adoption Act. **Matter of Adoption of L.C.J.W.**, 311 A.3d 41, 48 (Pa.Super. 2024); **see** 23 Pa.C.S.A. § 2511(a), (b). There are two parts to the analysis. First, Section 2511(a) requires the petitioner to establish the parent's conduct satisfies at least one of the enumerated grounds for

_____

[4] Counsel identifies a third issue, which is whether we should allow her to withdraw.

termination. **L.C.J.W.**, 311 A.3d at 48. Second, Section 2511(b) requires the petitioner to establish termination will best serve the needs and welfare of the child. **Id.** The petitioner must present clear and convincing evidence that termination is warranted. **In re Adoption of K.C.**, 199 A.3d 470, 473 (Pa.Super. 2018).

On review of the termination of parental rights, this Court will "accept the findings of fact and credibility determinations of the trial court if the record supports them." **Id.** "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." **Id.** We need only affirm the orphans' court's finding for termination under any of the grounds listed in Section 2511(a) before considering Section 2511(b). **In re D.L.B.**, 166 A.3d 322, 327 (Pa.Super. 2017).

Here, regarding Section 2511(a), the court found grounds for termination under subsections (a)(1), (a)(2), (a)(5), and (a)(8). As we need only affirm termination exist under one subsection, we confine our analysis to subsection (a)(2).

Termination is warranted under subsection (a)(2) if the petitioner provides clear and convincing evidence that the parent's conduct meets the following three elements:

> (1) repeated and continued incapacity, abuse, neglect or refusal;
>
> (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and

(3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re D.L.B.*, 166 A.3d at 327 (citation omitted).

A parent's "incapacity" to provide essential parental care, control, or subsistence for his child is not limited to affirmative acts of misconduct. *Id.* Rather, because "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties," *In re C.M.K.*, 203 A.3d 258, 262 (Pa.Super. 2019), parental incapacity exists when the parent fails "to demonstrate a concrete desire or ability to remedy the problems that led to [the c]hild's placement." *In re D.L.B.*, 166 A.3d at 327-28. For example, a parent demonstrates incapacity by failing to cooperate with agency services. *Id.* at 328.

A parent need never have had custody of the child for subsection (a)(2) to apply. *In re Z.P.*, 994 A.2d 1108, 1118 (Pa.Super. 2010). Furthermore, subsection (a)(2) does not require a court to allow a parent infinite time to demonstrate parental capacity. *Id.* at 1117. To this end, even a parent's "sincere efforts to perform parental duties" will not undermine a finding of incapacity under subsection (a)(2), particularly "after a long period of uncooperativeness." *Id.* at 1117-18 (citations omitted).

Section 2511(b) gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). This requires the court to place the child's best interest above the needs of the parent. *Int. of Z.N.B.*, 327 A.3d 241, 249 (Pa.Super. 2024). The court must "determine each child's specific needs" and consider "intangibles

such as love, comfort, security, and stability." *Id.* (quoting *Int. of K.T.*, 296 A.3d 1085, 1106 (Pa. 2023)). In determining a child's best interest, the court must review whether the child has a beneficial bond with the biological parent and the effect of severing any such bond, and whether the child is bonded to pre-adoptive foster parents. *Id.*

Here, the court found Father's "explanations regarding his efforts to work with CYS and to engage in visitation were not credible relative to [CYS's] evidence." Adjudication, J.J.H., 12/26/24, at 4; Adjudication, A.J.H., 12/26/24, at 4. It found that throughout most of the case, Father "showed resistance or noncompliance in following either CYS's efforts to secure planning or failed to cooperate with CYS agents in establishing his ability to properly assume care and custody of the [children]." Adjudication, J.J.H., at 3; Adjudication, A.J.H., at 3. It found that Father is "unable to provide proper physical and emotional support" to the children and that Father's relationship with the children is not beneficial to them. Adjudication, J.J.H., at 4; Adjudication, A.J.H., at 4.

In contrast, the court found that the children enjoy "caring, beneficial relationship[s]" with Foster Parents, and Foster Parents meet the children's "overall needs and welfare." Adjudication, J.J.H., at 4, 5; Adjudication, A.J.H., at 4, 5. The court concluded the children's best interests would be served by terminating Father's parental rights. Adjudication, J.J.H., at 5; Adjudication, A.J.H., at 5.

Overall, the court opined that Father's conduct amounted to a "refusal" and "evasion" of the assumption of parental responsibilities:

While [Father] articulates an obvious love of his [children], the overall picture shows a level of actual care that vitiates that expression. In some measure, his situation may evolve from economic/employment considerations. Still others may stem from a lack of sophistication or frustration. But, in some degree, [Father]'s actions (and inactions) seemingly reflect a resentment to [CYS's] effort to act upon its duty to provide protection and planning to the [children's] tumultuous world. [Father]'s apparent refusal to participate in a meaningful way presents itself as an extension of his sense that the parent-child relationship must yield to [Father]'s own predilections. In fact, the legal obligation requires a parent to be affirmative in the exercise of parental commitment and diligence.

While it is clear that the court may not suffer upon a parent the indignity and loss of removing a child from custody merely because the parent lacks economic advantages, the parent cannot seek to avail himself of the "protection" of impecunious circumstances as a pretext allowing him to consciously evade parental responsibilities. Despite the efforts to offer services provided to blunt [Father]'s challenging fiscal and housing situation [Father] has demonstrated no inclination or actual effort to cooperate.

Throughout, [Father] has not supplied or taken steps to show that he could offer his [children] safe housing and a stable, structured environment. Despite court Orders requiring [Father]'s participation and cooperation with CYS, he has evaded those commands. Even some periods of progress and compliance devolved into absence and excuses.

These repeated failures and concomitant lengthy delays can neither be justified nor explained. Such a repeated and continued incapacity to parent also provides a basis to terminate parental rights under the law. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)[,] citing 23 Pa. C.S. § 2511 (a)(2)). Additionally, parents are to make **diligent** efforts toward reasonably prompt assumption of full parental duties. *Id.* at 340 (emphasis added). [Father] engaged in half-hearted attempts, at best, to visit his children and no affirmative effort to establish his ability to offer

- 14 -

shelter to them. In the meantime, years have gone by and at critical ages for [the children], [Father] exemplified a lack of parental devotion which would normally be shown through a ". . . constant affirmative demonstration of parental love, protection and concern." *In re Adoption of M.J.K.*, 348 Pa. Super. 65, 73, 501 A.2d 648, 652 (1985). Even as this court remains obliged to attempt to maintain the integrity of the nuclear family, where the parent abjectly fails in meeting responsibilities to [a] child, it becomes easy to justify the need to remove the child from the arms of her biological parents so that others, better suited to provide care, can offer the child an opportunity to flourish — emotionally, physically and intellectually. . . .

The day of reckoning has now arrived, and this court can no longer abide the situation. [The children], whose limited expressions of any connection with [Father], ha[ve] now found respite and proper care. [They] ha[ve] resided in limbo long enough. Where a parent has expressed — through inaction, inability or deed — a lack of resolve to parent his child, the law requires that consideration be placed on the child's best interest, focusing on the child's safety and well-being. In terminating the rights of any parent, we have accorded [Father] the full measure due. In light of the situation, the [children] now deserves the complete assurance of care, support, nurturing and example that [they] never received [from Father].

Adjudication, J.J.H., at 7-8; Adjudication, A.J.H., at 7-8 (emphasis in original).

We find no reasonable basis on which to challenge the trial court's determination that subsection (a)(2) was met. While Father testified that he was fully compliant with CYS, he provided no documentation to substantiate his efforts, and the court found his testimony was not credible. We may not second-guess that finding. *K.C.*, 199 A.3d at 473. While Father was, at times, compliant with CYS and making progress on his case plan, that is not a basis for invalidating the court's finding of incapacity under subsection (a)(2). The court did not fail to consider Father's periods of compliance nor his bouts of progress, but concluded that his actions throughout the history of the case

have nonetheless demonstrated an incapacity to assume full parental responsibilities.

Counsel also notes an argument that the CYS caseworker admitted that CYS was not providing adequate reunification services to Father. However, the CYS caseworker's testimony was that CYS stopped working towards reunification some time prior to April 2024, when it filed the second petition for termination. *See* N.T. at 70. This testimony is not a basis for voiding the court's finding of incapacity based on documentation of Father's overall non-compliance during the preceding five years. Nor does it preclude termination. *See In re D.C.D.*, 105 A.3d 662, 675 (Pa. 2014) (stating that "the remedy for an agency's failure to provide services is not to punish an innocent child, by delaying her permanency through denying termination, but instead to conclude on the record that the agency has failed to make reasonable efforts," which results in the imposition of a fine).

Our review of the record discloses no non-frivolous issues. We therefore grant counsel leave to withdraw and affirm the decrees terminating Father's parental rights.

Decrees affirmed. Application/petition for leave to withdraw granted.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>7/8/2025</u>